DATE FILED
May 8, 2026 5:27 PM
FILING ID: 479BD896B5DA0
CASE NUMBER: 2026CV30150

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (as further defined below, this "***Agreement***") is made by and between MAVERIX LLC, a Colorado limited liability company ("***Maverix***") and MAVERIX BROADBAND, INC., a Colorado corporation ("***Maverix Broadband***", and together, the "***Sellers***") and COOPERREILLY INVESTMENT FUND, LLC, a Georgia limited liability company (together with its successors, assigns, and nominees, the "***Buyer***"). The Sellers and the Buyer are the "***Parties***".

## RECITALS

A. The Sellers operate a telecommunications and broadband company, which conducts the business of providing internet access or Wide Area Network connectivity to residential or business locations through the construction and operation of fiber optics or fixed wireless, whether at a retail or wholesale level, and similar services (the "***Business***"), which includes (i) a network funded without Financial Assistance Programs (as defined below) (the "***Non-Grant Network***"), and (ii) a network funded in whole or in part by Financial Assistance Programs (the "***Grant Network***").

B. On January 13, 2026, Buyer initiated an action against Sellers before the District Court for the City and County of Denver, Colorado (the "***Court***") in the case styled, *CooperReilly Investment Fund, LLC v. Maverix LLC, et al.*, No. 2026CV30150 (Colo. Dist. Ct. Denver Cty. Jan. 13, 2026).

C. On January 22, 2026, The Court issued its *Order Granting Verified Motion for Ex Parte Appointment of Receiver*, appointing Sonoran Capital Advisors as the receiver over all of Sellers' assets.

D. The Buyers desire to purchase substantially all of the assets related to the Non-Grant Network; specifically, the Sellers have agreed to sell to the Buyer and the Buyer has agreed to purchase from the Sellers all of the Acquired Assets, as of the Closing, and the Buyer is willing to assume from the Sellers all of the Assumed Liabilities as of the Closing upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows.

## AGREEMENT

## ARTICLE 1. DEFINITIONS.

As used herein, the terms below shall have the following respective meanings.

"***Accounts Receivable***" shall mean all accounts, accounts receivable, and notes receivable owed to the Sellers and all records and other information related to such accounts and accounts receivable.



EXHIBIT 2

Exhibit 1

"***Acquired Assets***" shall mean all property, assets, interests and rights of every nature, tangible and intangible of Sellers (real or personal, now or existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers), except the Excluded Assets. The Acquired Assets include but are not limited to all intellectual property, Fixed Assets, inventory, warranties, indemnities and all similar rights against third parties, books, and records. Unless disclosed by Seller with contemporaneous written documentation evidencing the grant funding of an asset, interest, or right, all Fiber Assets shall conclusively be deemed not to be an asset, interest, or right funded by grant funding (a "***Grant-Funded Asset***") and shall constitute an Acquired Asset. The Acquired Assets also include but are not limited to the following.

(a) All Customer Accounts.

(b) All rights of Sellers under the Assumed Contracts and Assumed Leases.

(c) All of Sellers' right, title, and interest in all of their Fiber Medium used in connection with the Non-Grant Network and Fiber Assets, including, without limitation, all fiber hung on utility poles and associated equipment and agreements; all underground fiber and conduit and associated agreements; and all cabinet and enclosures placed in a public or private right of way or easement.

(d) All Systems and network equipment relating to the Non-Grant Network, including, without limitation, all equipment owned by any Seller located at Customer locations.

(e) All Prepaid Expenses which arise from or relate to any of the Acquired Premises, including, without limitation, all security deposits under Assumed Leases, and all utility deposits.

(f) All goodwill and other intangible assets including, without limitation, all rights in and to all intellectual property owned or used by Sellers in connection with any of the Acquired Assets or any of the Acquired Premises, including, without limitation, the Autonomous System Number(s) in use by Sellers in connection with the Non-Grant Network; the names associated with the Business; phone numbers and domain names; the right to use existing telephone numbers, fax numbers, keys and codes for any security systems, to the extent transferable or assignable; rights under equipment warranties; building/construction warranties or other warranties, to the extent transferable or assignable; plans, engineering, and work related to the Non-Grant Network that is in-process by Sellers; Non-Grant Network network maps of Sellers; Internet Protocol space relating to the Non-Grant Network issued by the American Registry of Internet Numbers to Sellers along with the accompanying documentation of such space.

(g) All books and records relating to taxes imposed on the Acquired Assets or with respect to the Business.

(h) All advertising, marketing and promotional materials, drawings, brochures, creative materials, artwork, photographs and other printed or electronic materials.

(i) All books, financial information, records, files, ledgers, documentation, instruments, research, papers, data, marketing materials and information, sales or technical literature or similar information in the possession or control of any Seller including equipment records, files, receipts, and assignment documentation.

(j) All cash and cash equivalents, checks, checks in transit, credit card receivables, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

(k) All Accounts Receivable.

(l) All insurance policies of Sellers and all rights of any nature with respect to any such insurance policy, including all claims and proceeds under such insurance policies, and including workers' compensation insurance and related letters of credit, cash or other assets that serve as collateral with respect thereto.

(m) Any rights to tax refunds and claims related thereto, to the extent related to any period (or portion thereof) ending on (and including) or prior to the Closing Date.

(n) All Permits, including, but not limited to, those set forth in **Schedule 1**.

(o) All Customer lists, databases, and data, including names, email addresses, phone numbers, purchase history, and any other related information.

(p) A comprehensive list of all current and former factories, suppliers, vendors used in connection with the design, production, distribution, packaging, handling, manufacturing, sales, and servicing of the Seller's products and services, including contact information and order history.

(q) The equipment set forth in **Schedule 3**.

"***Acquired Premises***" shall mean all premises under any Assumed Leases.

"***Affiliate***" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"***Agreement***" shall mean this Asset Purchase Agreement, together with the exhibits and schedules attached hereto, as amended, restated, supplemented or otherwise modified from time to time.

"***Assumed Liabilities***" shall mean solely the following Liabilities:

(a) all Liabilities related to taxes imposed upon or assessed directly against the Acquired Assets attributable solely to any tax period (or portion thereof) beginning after the Closing Date. To the extent the Closing Date is during a billing period, for sales, use, Universal Service Fee, E911, 988 and Telecommunications Relay Services Taxes and similar Taxes and fees accrued prior to Closing Date but not billed to the Customer as of the Closing Date, Buyer will bill the applicable Customer, collect such Taxes and remit the same to the applicable Governmental Authority. Sellers will remain responsible for collecting, remitting and reporting all Taxes and fees billable to the Customer prior to the Closing Date even if such Taxes or fees are due and payable after the Closing Date.

(b) All Liabilities, to the extent arising from or after the Closing, except, in the case of taxes, to the extent attributable solely to any tax period (or portion thereof) beginning after the Closing Date, with respect to or relating to the ownership or operation of Buyer of any of the Acquired Assets.

(c) Employee benefits, compensation, or other arrangements arising on or after the Closing from the Buyer's employment of any Transferred Employees.

"***Backup Bidder***" shall have the same meaning as set forth in the Bidding Procedures.

"***Bidding Procedures***" shall mean the bidding procedures provided by Maverix and Maverix Broadband, as set forth in **Exhibit A**.

"***Bill of Sale***" means a bill of sale to be entered into by Sellers and Buyer concurrently with the Closing, together with any other assignments or other instruments of conveyance requested by the Buyer, all of which shall be in form and substance mutually acceptable to Buyer and Sellers.

"***Business Day***" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the States of Colorado are not required to open.

"***Communications Laws***" mean (a) the Communications Act and all rules, regulations and published policies of the FCC; (b) the Communications Assistance for Law Enforcement Act of 1994, and the rules and regulations promulgated thereunder; (c) state communications statutes and Laws, and all rules, regulations and published policies of a PUC; and (d) local communications statutes and Laws, and all rules, regulations and published policies of a local municipality or local franchising authority.

"***Contract***" shall mean any contract, agreement, indenture, note, bond, loan, instrument, conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property (other than any Leases).

"***Cure Costs***" shall mean all cure costs that must be paid or otherwise incurred by the Sellers in connection with the assumption and assignment of the Assumed Contracts and Assumed Leases as agreed by Sellers and applicable counterparties.

"***Customer***" means a user of the Non-Grant Network with an account with any Seller that pays (through cash, services, or trade) such Seller for telecommunications services to access the Internet or privately connect between locations, or pays any Seller for monitoring and network services on said account as detailed in such Seller's billing database. Customer excludes customers of the Grant Network.

"***Customer Accounts***" mean means an entry into any Seller's billing database that outlines Customer contact details, service address, services to be received, and the monthly rates associated with those services. Customer Accounts excludes accounts associated with customers of the Grant Network.

"***Environmental and Safety Requirements***" mean all federal, state, local, and non-U.S. statutes, regulations, ordinances, and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations, and all common law, in each case concerning pollution, protection of environment, or public or worker health or safety.

"***Employees***" shall mean all individuals, whether or not actively at work as of the date hereof, who (i) are employed directly or indirectly by any Seller as of the Closing Date and (ii) whose duties and responsibilities are primarily or exclusively related to the Business.

"***Excluded Assets***" means all properties, assets, interests, and rights of the Sellers other than the Acquired Assets, including:

(a) All bank accounts.

(b) All outstanding amounts relating to Governmental Authority programs, including, without limitation, the Employee Retention Credit, the Broadband Equity, Access and Deployment program under the Infrastructure Investment and Jobs Act, Capital Projects Fund programs, Colorado Broadband Deployment Board programs, and any other financial assistance, loan or similar program of any Governmental Authority (collectively, the "***Financial Assistance Programs***").

(c) All employee benefit plans.

(d) All Contracts other than Assumed Contracts and all Leases other than Assumed Leases.

(e) All capital stock and equity interests in and to each of the Sellers.

(f) Any claims of Sellers or their respective estates against any Person of every kind and description, or any director, officer, insider, auditor, or accountant of Sellers.

(g) All (i) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to any Seller's organization, maintenance, existence, and operation; (ii) books and records, correspondence or communications to the extent related to (A) taxes paid or payable by the Sellers, (B) any claims, obligations or liabilities not included in Assumed Liabilities, or (C) this Agreement, any Transaction Documents or the negotiation or consummation of the Transactions (and including any attorney-client privilege associated with any of the items described in the preceding clauses (A), (B) or (C)).

(h) All of Sellers' rights under any Excluded Assets.

(i) All inter-company receivables and inter-company payables, none of which shall be enforceable against Buyer or the Acquired Assets.

"***Excluded Liabilities***" means any Liabilities of Sellers that are not Assumed Liabilities, including, without limitation:

(a) All costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions.

(b) Any unjust enrichment penalty due pursuant to 47 C.F.R. § 1.2111(b) as a condition for approval of the Transactions by the FCC.

(c) Any environmental Liability.

(d) All Liabilities, to the extent not Assumed Liabilities, (i) related to any current or former employee, candidate for employment, officer, director, consultant, or contractor of any Seller arising prior to the Closing Date, or (ii) arising under, in connection with or in any way relating to any benefit plan at any time maintained, sponsored, contributed to or required to be contributed to by any of Sellers. Buyer is not assuming any termination, severance, change of control or similar liability under any agreement or policy of any of the Sellers. Buyer is not assuming any Liabilities for any current or former employee or independent contractor lawsuits or claims of any nature, include without limitation, discrimination, wage and hour practice or any similar claims arising from their work for any of the Sellers.

(e) All Liabilities for any and all taxes of or imposed on Sellers (including any Liability of Sellers for the taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by Contract or otherwise).

(f) All Liabilities to any broker, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating to the transactions contemplated by this Agreement for which any Seller is responsible.

(g) All Liabilities for injury to employees, customers, contractors, and all others, to the extent arising prior to the Closing Date.

(h) All Liabilities exclusively relating to or primarily arising out of an Excluded Asset.

(i) All Liabilities under the WARN Act related to the Transactions or the Sellers.

(j) All Liabilities that are not Assumed Liabilities.

(k) All Indebtedness.

(l) All Liabilities for accounts payable of any of the Sellers.

(m) All Liabilities related to Transfer Taxes related to the Transaction.

(n) All customer credits, sales promotions, rebates, coupons, and loyalty programs, returns of goods or merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements and related adjustments in the ordinary course of business with respect to goods or merchandise.

"***FCC***" means the Federal Communications Commission.

"***Fiber Assets***" include Fiber Medium related infrastructure items elements utilized to provide service(s) to Customers including, without limitation, conduit; fiber; lashings; hangers; messenger wire; cable clamps; cable support; suspension and tension devices and clamping; slack storage devices including snowshoes; pole attachments; pole standoffs; splice cases; splice or quick attach terminals; vaults; pedestals; flowerpots or mini-vaults; drop cable and conduit from easement to customer location; Optical Network Terminals; Optical Line Terminals; and Service Network Interfaces. For the avoidance of doubt, any Fiber Assets that are part of the Grant Network that are essential, useful, or necessary for the continued operation of the Non-Grant Network are included in Acquired Assets. In the event that an ownership transfer of the specific asset is not possible or requires regulatory consent, Buyer may elect to have Seller retain such asset subject to the IRU, as defined in Section 3.1(b)(iv), and the Parties will work in good faith to ensure that there is no interruption of service to the Non-Grant Network.

"***Fiber Medium***" means the technology used to transmit data through glass, plastic, or other composite material threads as that term is generally understood in the telecommunications industry.

"***Fixed Assets***" means, to the extent owned by Sellers, all machinery, equipment, furniture, trade fixtures, leasehold improvements, tools, signs and all other items of fixed assets and tangible personal property (including inventory) whether located at the Acquired Premises or otherwise, including, without limitation, such machinery, equipment, furniture, trade fixtures, tools, signs, safes and other items of tangible personal property to the extent transferred to the Buyer as part of the Assumed Contracts or Assumed Leases.

"***GAAP***" shall mean generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"***Governmental Authority***" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government, (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange.

"***Hazardous Materials***" mean all chemicals, pesticides, pollutants, contaminants, materials, substances, or wastes for which liability or standards of conduct may be imposed under Environmental and Safety Requirements, including, without limitation, any petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, odors, and radiation.

"***Indebtedness***" of any Person shall mean the principal, interest, and other obligations for borrowed money of which such Person is responsible or liable, and all guaranty and surety obligations, secured and unsecured (including any costs, legal fees, penalties, premiums, or fees).

"***Leases***" shall mean all leases, subleases, licenses, concessions, options, easements, rights of way, rights of use, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates, pole attachment and conduit access agreements, and other agreements (written or oral), and any amendments or supplements to the

foregoing, and recorded memoranda of any of the foregoing, including, without limitation, any Tower Lease.

a portion of any moveable, communications structure, which may or may not be affixed to a building or to the ground (a “, owned by another Person, or a lease

“***Liabilities***” shall mean, as to any Person, all Indebtedness, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever.

“***Lien***” shall mean any charge against or interest in property to secure payment of a debt or performance of an obligation, and shall include any pledge, option, charge, lien, license, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

“***Loan Documents***” means the following documents and instruments made by the Parties, and all other documents and instruments executed in connection therewith, together with all amendments thereof:

(a) A Loan and Security Agreement dated March 22, 2024.

(b) A Secured Promissory Note dated March 22, 2024.

(c) A First Amendment to the Loan and Security Agreement and Secured Promissory Note dated May 29, 2024.

(d) A Second Amendment to Loan and Security Agreement and Secured Promissory Note dated August 24, 2024.

(e) A Continuing Unconditional Guaranty dated March 22, 2024, made by the VIATH, INC., a Colorado corporation, in favor of the Lender.

(f) A Deposit Account Control Agreement dated March 22, 2024, made by Maverix Broadband, the Lender, and Alpine Bank.

(g) A Deposit Account Control Agreement dated March 22, 2024, made by the VIATH, INC., a Colorado corporation, the Lender, and Alpine Bank.

(h) A Forbearance Agreement to Loan and Security Agreement and Secured Promissory Note dated June 24, 2025.

(i) A Second Forbearance Agreement, effective as of October 14, 2025.

“***Outside Date***” shall mean fourteen (14) days after the Court issues a final, non-appealable order approving this Agreement.

"***Permits***" shall mean permits, licenses, registrations, certificates, certificates of occupancy, accounts, approvals, consents, clearances and other authorizations issued by any Governmental Authority, including, without limitation, the FCC and any PUC.

"***Permitted Liens***" shall mean: (a) the Senior Liens; (b) Liens for taxes not yet due and payable; (c) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the ordinary course of business for sums not yet due; (d) applicable zoning, subdivision, building and other land use laws and other land use restrictions that do not impair the present use of the Acquired Premises; (e) liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement; (f) easements, covenants, conditions, restrictions and other similar encumbrances that arise in the ordinary course of business; (g) non-exclusive licenses granted in the ordinary course of business.

"***Person***" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Authority or any other entity.

"***Prepaid Expenses***" shall mean, as of any date, payments made by Sellers, including, without limitation, advance payments, charges, claims, credits, deposits, escrows, refunds, rights of recovery, rights of recoupment, rights of setoff, security, and security deposits related to the Customers or Non-Grant Network, other than utilities that relate to the Acquired Premises.

"***Proceeding***" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), commenced, brought, conducted or heard by or before any Governmental Authority, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the law of any jurisdiction.

"***PUC***" means the state or local public utilities commission.

"***Representative***" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"***Senior Liens***" mean the following:

| **Debtor** | **Secured Party** | **Collateral** |
|---|---|---|
| Maverix | De Lage Landen Financial Services, Inc. | (1) ONE VERMEER PTX44 TRENCHER S/N 1VR8072SPM1001574, (1) ONE VERMEER PTX42 TRENCHER S/N 1VRK0724CM1000171 |
| Maverix Broadband | First Western Bank & Trust | Any and all equipment leased or financed by debtor and described in or subject to Agreement No. EFA13591201D |

| | | |
|---|---|---|
| Maverix Broadband | M&T Bank Corporation | All equipment, peripherals, and inventory financed under and described in Schedule 1 to Master Lease Agreement 2024-0100 |

"***Successful Bidder***" shall have the same meaning as set forth in the Bidding Procedures.

"***Systems***" mean the broadband, cable, internet, and voice systems and revenue-generating business in respect thereof that provide, cable television, voice, broadband, telecommunications services and other similar services to customers of Sellers, including the associated facilities interconnecting or designed to interconnect with such systems and including, without limitation, all Fiber Medium, Fiber Assets, conduit, wireless, and similar equipment

"***Tower***" shall means a movable, communications structure, which may or may not be affixed to a building or to the ground.

"***Tower Lease***" means a Contract or Lease to place equipment on a portion of a Tower owned by another Person; and a Contract or Lease for use of an entire Tower owned by another Person.

"***Transaction Documents***" shall mean this Agreement, the Bill of Sale, and any agreement, instrument or other document entered into pursuant to the terms hereof.

"***Transactions***" shall mean the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets as provided for in this Agreement.

"***Transfer Tax***" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to tax or interest with respect thereto, but such term shall not include any tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"***USAC***" means the Universal Service Administrative Company.

"***WARN Act***" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

## ARTICLE 2. ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES.

2.1. Assets to be Acquired. Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Sellers all of Sellers' right, title and interest, free and clear of all claims (other than Assumed Liabilities) and Liens (except for the Permitted Liens), in each and all of the Acquired Assets, including the Acquired Premises; however the Buyer shall not acquire any Excluded Assets.

2.2. Liabilities to be Assumed by Buyer. Subject to the terms and conditions of this

Agreement, at the Closing, Sellers shall assign to Buyer, and Buyer shall assume from Sellers and pay when due, perform and discharge, in due course, without duplication, each of the Assumed Liabilities.

2.3. Excluded Liabilities. Buyer shall not and does not assume, and shall be deemed not to have assumed and shall not be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Excluded Liabilities.

2.4. Wrong Pockets. If after the Closing (i) Buyer or any of its Affiliates holds any Excluded Assets or Excluded Liabilities or (ii) any Seller holds or receives any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party. Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party. Buyer or the applicable Seller will cooperate with each other to communicate with any third party about the Transactions.

2.5. Assumption and Assignment of Contracts and Leases.

(a) Sellers shall assume and, to the extent assignable, assign to Buyer all Contracts and Leases that are necessary to Seller's Non-Grant Network Business, in Buyer's discretion, including, without limitation, those Contracts and Leases listed on **Schedule 2** (such Contracts, the "***Assumed Contracts***", and such Leases, the "***Assumed Leases***"). At the Closing, Sellers shall, pursuant to the Bill of Sale, sell, and assign to Buyer and Buyer shall assume (the consideration for which is included in the Purchase Price), all Assumed Contracts and Assumed Leases, subject to provision by Buyer of adequate assurance and payment by Seller of the Cure Costs at Closing in accordance with Section 6.4 in respect of Assumed Contracts and Assumed Leases. At the Closing, Buyer shall assume, and thereafter in due course and in accordance with its respective terms (as may be amended) pay, fully satisfy, discharge and perform all of the Assumed Liabilities under each Assumed Contract and Assumed Lease.

(b) To the extent that any Seller's rights under any Assumed Contract or Assumed Lease, or any other Assumed Asset, may not be assigned to Buyer without the consent or approval of another Person which has not been obtained at or prior to the Closing, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and each Seller, at its expense, including any assignment fees required by another Person, shall use its best efforts to obtain any such required consents or approvals as promptly as possible. If any such consents or approvals shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Assumed Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Sellers shall take all actions after the Closing as Buyer's agent in order to obtain, for Buyer, the benefits thereunder and shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

## ARTICLE 3. CLOSING; PURCHASE PRICE.

3.1. Closing; Transfer of Possession; Certain Deliveries.

(a) The consummation of the Transactions (the "***Closing***") shall take place after the Court issues an order approving the Agreement and on the date of the satisfaction or waiver of all of the conditions set forth in Article 7 or on such other date as the Parties hereto shall mutually agree. The Closing shall be held by electronic exchange of executed documents. The actual date of the Closing, effective 12:00 a.m. prevailing Mountain time on such date, is herein called the "***Closing Date***".

(b) At the Closing, Sellers shall deliver to Buyer:

(i) the duly executed Bill of Sale;

(ii) for each Seller, a duly executed and completed IRS Form W-9; and

(iii) such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer, including, without limitation, evidence of the FCC and PUC approvals and any other approvals, authorizations, or consents required pursuant to any Assumed Contract, Assumed Lease, or applicable law; all account information, usernames, and passwords necessary to provide Buyer with access to any of the Assumed Assets.

(iv) a Perpetual, Irrevocable, Royalty-Free License and Indefeasible Right to Use (the "***IRU***"), in form and substance reasonably acceptable to Buyer, duly executed by Sellers, granting Buyer and its successors and assigns the right to use, access, maintain, repair, replace, and interconnect with any Grant-Funded Asset to the extent necessary for the operation, maintenance, or expansion of the Non-Grant Network or the Business, for the useful life of such Grant-Funded Asset, which IRU shall run with the asset and survive any transfer of the Grant-Funded Assets to any Governmental Authority or successor grantee.

(c) At the Closing, Buyer shall deliver to Sellers:

(i) payment by wire transfer of immediately available funds to an account specified by the Sellers of an aggregate amount equal to (A) the Cash Consideration, minus (B) the Good Faith Deposit.

(ii) the duly executed Bill of Sale; and

(iii) such other assignments and other instruments of transfer or conveyance as the Buyer may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer.

3.2. Consideration. The aggregate consideration for the Acquired Assets (the "***Purchase Price***") shall be equal to the sum of:

(a) The Buyer's credit bid in the amount of $7,000,000.00 (the "***Credit Bid Amount***"); plus

(b) Additional cash consideration of $25,000.00 (the "***Cash Consideration***").

3.3. Good Faith Deposit.

(a) Upon the execution of this Agreement, Buyer shall immediately make a good-faith deposit in immediately available funds of at least ten percent (10%) of the Cash Consideration (the "***Good Faith Deposit***");

(b) The Good Faith Deposit shall be released and delivered to either Buyer or Sellers, as applicable, in accordance with the Bidding Procedures. If this Agreement is terminated for any reason, the Good Faith Deposit, together with all accrued investment income thereon, shall be returned to Buyer within five (5) Business Days of such termination.

3.4. Operating Expenses. The Buyer shall not be liable for, and the Sellers shall remain solely liable for all of the following amounts owed, or coming due, or allocable to, all time periods prior to the Closing: property and personal taxes (including Transfer Taxes), lease payments under any Leases (and in no event shall Buyer be responsible for any accrued amounts due under any Assumed Leases as of the Closing Date), and no such amounts shall be adjustments to the Purchase Price.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF SELLERS.

Sellers jointly and severally hereby represent and warrant to Buyer, as of the Effective Date and as of the Closing as follows:

4.1. Organization. Each Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate or limited liability company power and authority, as applicable, to own and hold its assets, rights and properties and to conduct its business as now owned, held and conducted in its jurisdiction of organization and in the other jurisdictions in which it is required to register or qualify to do business.

4.2. Authorization of Transaction. Each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyer) shall constitute the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

4.3. Governmental Consents. Other than as required by or pursuant to the Bidding Procedures Order, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Transaction Document.

4.4. Acquired Assets. Upon the terms and subject to the conditions contained in this Agreement, at the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the Acquired Assets. Sellers shall convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all claims (other than Assumed Liabilities) and Liens (other than Permitted Liens).

4.5. Litigation; Orders. Neither any Seller nor any of the Sellers' property is or at any time has been a party to, subject to or, to Sellers' knowledge, threatened with any claim, Proceeding, litigation, legal or equitable action, or other proceeding, including but not limited to any that seek to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby (whether as plaintiff, defendant or otherwise and regardless of the forum or the nature of the opposing party). There has been no reservation of rights by any insurance carrier, and no such reservation is threatened, concerning the coverage of Sellers with respect to any matter required to be disclosed pursuant to the immediately preceding sentence.

4.6. Compliance with Laws. Sellers have not received any written notice of or been charged with the violation of any laws and no such violations have occurred or are occurring.

4.7. Employment Matters.

(a) No current or former Employee is covered by, and the Sellers are not bound by, a collective bargaining or other labor-related agreement with any union or employee organization. The Sellers are not a party to, or otherwise bound by, any order, consent decree with, or citation by, any Governmental Authority relating to employees or employment practices. There are no pending or threatened lawsuits or claims related to employees or employment practices, including, without limitation, any discrimination, wage and hour or similar claims.

(b) Sellers are in compliance in all material respects with all applicable laws, agreements, contracts and policies relating to employment, employment practices, human rights, wages, hours, meals and rest period breaks, job classifications and terms and conditions of employment.

4.8. Compliance; Permits.

(a) None of the Sellers has received any notice or other communication from any governmental authority alleging any violation of law with respect to any part of the Acquired Premises or the Business which has not been entirely corrected and no such violation has occurred or is occurring.

(b) None of Sellers has received any written notice or other communication that it is in violation of any applicable law with respect to the conduct of its Business that have not been fully

and finally resolved with no continuing potential for liability or obligation. None of Sellers has been charged with, or is in receipt of any notice or written warning of, or, to Sellers' knowledge, under investigation with respect to, any failure or alleged failure to comply with any provision of any applicable law.

(c) Sellers possess all Permits necessary to use and operate the Assumed Assets in Sellers' Business. **Schedule 1** contains a true and complete list of all Permits held by Sellers.

4.9. The Buyer shall not be liable to the Seller or to any investment banker, broker, finder, agent or similar intermediary in connection with this Agreement, the other Transaction Documents, or the Transactions contemplated hereby for any broker's fee, finder's fee, or similar fee or commission, all of which Liabilities are and shall remain the sole and exclusive obligation of the Sellers, and the Sellers shall indemnify and hold the Buyer harmless from and against any claims for such amounts by such Persons.

4.10. Environmental and Safety Matters. Except as set forth herein,

(a) Each Seller is, and during the five (5) years has been, in compliance in all material respects with all Environmental and Safety Requirements and no Seller has received any notice, report, order, directive or other information, or is subject to any pending, or to the Seller's knowledge, threatened action, regarding any actual or alleged violation of, or any Liabilities under, Environmental and Safety Requirements.

(b) None of the following exists at any property or facility owned or operated by any Seller or any Leased Realty: (i) underground storage tanks, (ii) asbestos containing material in any form or condition, (iii) materials or equipment containing polychlorinated biphenyls, (iv) landfills, surface impoundments, or disposal areas, or (v) groundwater monitoring wells, potable drinkable water wells, petroleum wells or production water wells.

(c) No Seller has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or released any Hazardous Materials on or at any property subject to an Assumed Lease (the "***Leased Realty***"), which has resulted or could result in any Liabilities pursuant to any Environmental and Safety Requirements. No Leased Realty is contaminated by any Hazardous Material, which has resulted or could result in any Liabilities pursuant to any Environmental and Safety Requirement.

(d) None of the Assumed Assets contain Hazardous Materials that has resulted or could result in any Liabilities pursuant to any Environmental and Safety Requirements.

(e) The Sellers have furnished to Buyer all material environmental reports, audits, and assessments relating to the Assumed Assets and specifically as to the Leased Realty that is in its possession or under its reasonable custody or control.

4.11. Communications Regulatory Matters.

(a) Each Seller and all of the Assumed Assets (including the Systems) are, and, within the past five (5) years, have been, in compliance in all material respects with the Communications

Laws, including all required registrations, authorizations, reporting forms, certifications and notices, and payment of all fees and assessments. No Seller has received any notice claiming a violation by any Seller or any of their respective officers, directors, managers, members, employees or equity holders of any provision of any of the Communications Laws, and there is not pending, or to the knowledge of each Seller, threatened, any investigation or inquiry concerning any Seller's compliance with any of the Communications Laws.

(b) The Permits identified at **Schedule 1** contain all of the Permits necessary from the FCC or PUC in connection with the operation of the Systems or the Non-Grant Network.

(c) No Permit is subject to (i) any conditions or requirements that have not been imposed generally upon licenses in the same service, unless such conditions or requirements are set forth on the face of the applicable authorization, or (ii) any pending regulatory action, or notice, inquiry or, to the knowledge of Seller, investigation that, in each case, would reasonably be expected to lead to such Action, or judicial review before a Governmental Authority. Assuming that the FCC and PUC approvals have been granted and are in full force and effect as of the Closing, no Permit will be subject to suspension, modification, revocation, or nonrenewal as a result of the execution and delivery of this Agreement or the consummation of the Transactions.

(d) Each Seller is in compliance with each Permit and has fulfilled and performed all of its obligations with respect thereto, including all reports, filings, notifications, payments and applications required by the Communications Laws or similar rules, regulations, policies, instructions and orders of any PUC, and the payment of all regulatory fees and contributions, except for exemptions, waivers or similar concessions or allowances. Specifically but without limitation, each Seller has filed or will timely file all required FCC Broadband Data Collection submissions, including all mapping submissions; and all PUC submissions and state mapping requirements.

(e) Each Seller has complied with all requirements, rules, restrictions, and other terms and conditions associated with the receipt and use of funding from any program established under the federal Universal Service Fund or any state universal service or other similar fund, including, without limitation, the FCC's E-Rate and rural healthcare programs ("**Universal Service Programs**"). There are no pending, or to the knowledge of Seller, threatened Actions by any Governmental Authority or USAC regarding any Seller's use of, or entitlement to, any funding received from a Universal Service Program. All data and other reports submitted to any Governmental Authority or USAC in connection with participation by any Seller in any Universal Service Programs are true, correct, and complete in all material respects.

(f) Within the past five (5) years, each Seller has submitted all reports in a complete, accurate, and timely manner, including FCC Forms 499-A and 499-Q (or corrected any inaccuracies such that all FCC Forms 499-A and 499-Q are filed completely and accurately within the permissible time available for revisions), and paid all license, regulatory or other fees and charges due to the FCC, USAC, any PUC or any fund established by the FCC or any PUC pursuant to the Communications Laws. No Seller currently owes any contributions to any fund established by the FCC, USAC, or to any PUC. There is no Action pending or, to the knowledge of Seller, threatened before the FCC or USAC which questions the amounts paid by any Seller pursuant to the Communications Laws. Without limiting the foregoing, no Seller has received any notice from

USAC or the FCC questioning the accuracy of or claiming or identifying any inaccuracy in any of any Seller's FCC Forms 499-A or 499-Q, any of any Seller's contributions to any Universal Service Program, Telecommunications Relay Service fund, North American Numbering Plan Administration, or Local Number Portability Administration, or any of the Seller's determinations that any such contributions are not required.

(g) Each Seller has complied with all applicable requirements concerning the provision of 911 and enhanced 911 services.

**ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer hereby represents and warrants to Sellers, as of the Effective Date, and as of the Closing, as follows.

5.1. Organization. Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Buyer has all necessary limited liability company power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2. Due Authorization, Execution and Delivery; Enforceability. Buyer has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions. This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms, in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3. Adequate Assurances Regarding Executory Contracts. Buyer is capable of providing adequate assurance of future performance of its obligations with respect to the Assumed Contracts and Assumed Leases.

5.4. Exclusive Representations and Warranties. Except for the representations and warranties contained in this Article 5, none of Buyer, its Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Buyer. Except for the representations and warranties contained in this Article 5, Buyer disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their Representatives (including any opinion, information, projection, or advice that may have been or

may be provided to Sellers by any Representative of Buyer or any of their respective Affiliates). The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE 6. COVENANTS OF THE PARTIES.

6.1. Conduct of Business Pending the Closing. Except as previously disclosed to the Buyer, during the period from the date of this Agreement and continuing until the earlier of (i) the termination of this Agreement in accordance with its terms and (ii) the Closing (the "***Interim Period***"), except as may be required by applicable law, Sellers shall carry on the Business in the ordinary course of business, using its commercially reasonable efforts to preserve the Business and assets and its business relationships, continuing to operate its billing and collection procedures, using its commercially reasonable efforts to retain key employees, and maintaining its business records in accordance with its past practices. Sellers and Buyer are not and do not intend to be joint employers at any time, and nothing in the Agreement may be construed as creating a joint employer relationship between Sellers and Buyer or creating liability for Buyer as a successor of Sellers. Notwithstanding the first sentence of this Section 6.1, during the Interim Period Sellers shall not, without the prior written consent of Buyer:

(a) enter into, modify, amend, terminate, waive any material rights or obligations under or otherwise seek to reject any Contract and Leases;

(b) sell, transfer, convey, assign, or otherwise dispose of any of the Acquired Assets or permit the Sellers to purchase any assets outside of the ordinary course of business;

(c) mortgage, pledge or subject to Liens on the Acquired Assets or any other assets of the Sellers;

(d) institute, settle, compromise or agree to settle any (i) material Proceeding before any Governmental Authority relating to the Sellers or (ii) any pending or threatened claim that could give rise to Liabilities or could impose any binding obligation, whether contingent or realized, on the Sellers;

(e) enter into any Contract providing for capital expenditures with respect to the Business;

(f) directly or indirectly (including through any Affiliates), in any manner or capacity whatsoever, solicit, induce or attempt to induce or cause any employee of the Sellers to leave the employ of the Sellers;

(g) sell or dispose of any of the machinery, equipment, furniture or other items held in storage provided Sellers may move such items as needed for ongoing operations consistent with recent practices; or

(h) authorize, commit, agree to or enter into any Contract to do any of the foregoing.

6.2. Access. Subject to applicable law, during the Interim Period, Sellers (a) shall give

Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, data, books and records of Sellers as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement, (b) shall furnish to Buyer and its Representatives such financial, operating and property data and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Business, including access to facilities or other Acquired Assets and communication with customers and vendors as the case may be. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Acquired Premises by Sellers.

6.3. Further Assurances. From and after the Closing, the Parties agree to, at the requested Party's sole cost and expense, (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; provided that nothing in this Agreement shall prohibit Sellers from ceasing operations or winding up their affairs following the Closing.

6.4. Cure Costs. Sellers shall sell, transfer, and assign all Assumed Contracts and Assumed Leases to Buyer, and Buyer shall purchase and assume all Assumed Contracts and Assumed Leases from Sellers, as of the Closing Date. In connection with debts incurred or the assignment and assumption of the Assumed Contracts and Assumed Leases, the Sellers shall cure any monetary defaults of the debts incurred or under the Assumed Contracts and Assumed Leases by payment of any Cure Costs in cash as determined in accordance with the Bidding Procedures Order. Buyer shall be responsible for demonstrating and establishing adequate assurance of future performance with respect to the Assumed Contracts and Assumed Leases.

6.5. Preservation of Books and Records. For a period of one (1) year after the Closing Date, Buyer shall provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without undue interference to the business operations of Buyer, and at Sellers' sole cost and expense) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets, to the extent necessary to permit Sellers to determine any matter relating to their rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Sellers in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records for no less than such one (1) year period.

6.6. Notification of Certain Matters. Sellers and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article 3 not to be satisfied as of any date, or (b) the

receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 6.6 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

6.7. Confidentiality. From and after the Closing, Sellers shall keep confidential all non-public information regarding the Acquired Assets, except for (i) such public disclosure as Sellers and their counsel may reasonably determine to be required under any applicable law, regulation, stock exchange requirement, or order (provided that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable law and, where applicable and reasonably requested by Buyer and at Buyer's sole cost and expense, Sellers will use commercially reasonable efforts to cooperate with Buyer to obtain a protective order or other confidential treatment or otherwise limit the scope of information that is required to be disclosed, and Sellers shall only disclose that portion of such information as Sellers are advised by their counsel in writing is required to be disclosed) and (ii) disclosure to its representatives (including any prospective or actual financing sources, whether debt or equity) solely to the extent that such parties need to know such information and agree to be bound by confidentiality obligations no less protective than those set forth in this Section 6.7.

6.8. Employees. At any time prior to the Closing Date, Buyer shall provide Sellers a list of any Employees that Buyer would like to interview and/or make an offer of employment. Each Employee who accepts any such offer shall be deemed a "***Transferred Employee***". Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing, and with respect to each of the Employees who is then employed by Sellers, Buyer shall make commercially reasonable efforts to keep such employment at the same location, at the same base wage or hourly rate, with employee benefits which are substantially comparable in the aggregate and on the same terms and conditions of employment as in effect immediately prior to the Closing. Buyer shall give each Transferred Employee credit for years of service with Sellers for purposes of determining compensation time under new employment with Buyer. To the extent permitted by law, Sellers shall deliver a notice, which, at the option of Buyer, may be a joint notice by Buyer and Sellers, to each of the Transferred Employees in a form reasonably satisfactory to Buyer (i) informing such Transferred Employees about the sale of the Acquired Assets to Buyer, and (ii) terminating their employment with Sellers. Sellers shall permit Buyer to concurrently send a notice to each of the Transferred Employees in a form reasonably satisfactory to Sellers describing their offer of employment by Buyer, if any, and providing contact information for any questions.

6.9. Permits. Until the Permits are transferred to Buyer or, if nontransferable, Buyer obtains new Permits, Sellers

(a) agree to maintain all Permits required for the operation of the Assets being sold under this Agreement;

(b) shall ensure that all Permits remain in full force and effect;

(c) in the event that any Permit requires renewal or additional action to remain valid, shall promptly undertake such actions at Buyer's cost and expense, provided such costs and expenses are actual and necessarily incurred; and

(d) Sellers shall cooperate with Buyer in preparing and submitting any applications or documents necessary to transfer or obtain new Permits in Buyer's name, as required for the continued operation of the Assets after the Closing Date.

## ARTICLE 7. CONDITIONS TO OBLIGATIONS OF THE PARTIES.

7.1. Conditions Precedent to Obligations of Buyer. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a) Accuracy of Representations and Warranties. The representations and warranties of Sellers set forth in Article 4 shall be true and correct as of the Effective Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b) Performance of Obligations. Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date, including all deliveries required under Section 3.1(b).

(c) Officer's Certificate. Buyer shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in Section 7.1(a), and Section 7.1(b) have been fulfilled.

(d) No Order. No court or other Governmental Authority has issued, enacted, entered, promulgated or enforced any law or order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

7.2. Conditions Precedent to the Obligations of Sellers. The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

(a) Accuracy of Representations and Warranties. The representations and warranties of Buyer shall be materially true and correct at and as of the Closing as though made at and as of the Closing (except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b) Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date, including all deliveries required under Section 3.1(c).

(c) No Order. No court or other Governmental Authority has issued, enacted, entered, promulgated or enforced any law or order (that is final and non-appealable and that has not been

vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

7.3. Frustration of Conditions Precedent. Neither Buyer nor Sellers may rely on the failure of any condition set forth in this Article 7, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions contemplated hereby.

## ARTICLE 8. TERMINATION

8.1. Termination of Agreement. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a) by written agreement of Buyer and Seller;

(b) by Buyer if there shall be any law that makes consummation of the Transactions illegal or otherwise prohibited, or if any order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such order shall become final;

(c) by Buyer by giving written notice to each Seller if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that would prevent the satisfaction of the conditions to the obligations of Buyer at Closing set forth in Section 7.1(a), and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) three (3) days after receipt of Buyer's notice of such breach, and (B) the Outside Date;

(d) by Buyer if Buyer is neither the Successful Bidder nor the Backup Bidder following the Auction; or

(e) by Buyer if the Closing shall not have occurred on or before the Outside Date.

8.2. Consequences of Termination. In the event of any termination of this Agreement by Buyer pursuant to Section 8.1, written Notice thereof shall be given by Buyer to Sellers, and this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 3.3, this Section 8.2 and Article 9 and to the extent applicable in respect of such Sections and Article, Article 1), and the Transactions shall be abandoned without further action. For the avoidance of doubt, nothing in this Agreement shall prevent Buyer, as lender, from enforcing its rights and remedies against Maverix and Maverix Broadband, as borrowers, under the Loan Documents.

## ARTICLE 9. MISCELLANEOUS

9.1. Expenses. Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

9.2. Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided that Buyer may, without the consent of any other party, assign this Agreement and its rights and obligations hereunder in whole or in part to (a) any Affiliate; provided that Buyer shall remain jointly liable with such Affiliates for Buyer's obligations hereunder; (b) Buyer may take title to some or all of the assets through one or more affiliated nominees at Closing; or (c) following the Closing, to any successor or purchaser of all or part of the business of Buyer or any of its subsidiaries. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including any liquidating trustee, responsible Person or similar representative for Sellers.

9.3. Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estate), Buyer and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4. Notices. All notices, demands, requests, consents, approvals or other communications required or permitted to be given hereunder or that are given with respect to this Agreement (all "***Notices***") shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail with confirmation of receipt; provided that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. EDT, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to any Seller: | Maverix Broadband, Inc.<br>10940 S Parker Road, Unit 418<br>Parker, CO 80134<br>Attn: David Lindauer |
| With copy to: | Bush & Ramirez<br>5615 Kirby Drive, Suite 900<br>Houston, Texas 77005<br>Attn: Zach Crow |
| If to Buyer: | CooperReilly Investment Fund, LLC<br>4395 Harris Trail, NW<br>Atlanta, GA 30327<br>Attn: D. Matthew Middelthon |
| With copy to: | Markus Williams LLC |

1775 Sherman St., Ste. 1950
Denver, CO 80203
Attn: Patrick R. Akers

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5. Choice of Law. This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the laws of the State of Colorado, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.6. Entire Agreement; Amendments and Waivers. This Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7. Counterparts; Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be executed via physical or electronic signature and delivered via electronic mail, or other means of electronic transmission. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.8. Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.

9.9. Headings. The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.10. Jurisdiction; Venue. Notwithstanding anything herein to the contrary, the Parties hereby agree that all claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the District of Colorado or, if that court does not have subject matter jurisdiction, in any state court located in Colorado (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

9.11. WAIVER OF RIGHT TO TRIAL BY JURY. SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.11 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.12. Survival. Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing. Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing (each, a "***Post-Closing Covenant***")) shall expire and be of no further force and effect as of the Closing. Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, sixty (60) days following the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

9.13. Time of Essence. Time is of the essence of this Agreement.

9.14. No Recourse to Buyer. No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Buyer shall have any Liability for any Liabilities of Sellers under this Agreement or for any claim based on, in respect of, or by reason of the Transactions.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

**SELLERS**

MAVERIX LLC, a Colorado limited liability company

By: Bryan Perkinson, for Sonoran Capital Advisors, solely in its capacity as Receiver for MAVERIX LLC, a Colorado limited liability company, as defined in the *Order Granting Verified Motion for Ex Parte Appointment of Receiver* dated January 22, 2026 in Case No. 2026CV30150, Denver District Court

Signed by:

By: ______________________________

E69134AAC4CD4CD...

Bryan Perkinson

MAVERIX BROADBAND, INC., a Colorado corporation

By: Bryan Perkinson, for Sonoran Capital Advisors, solely in its capacity as Receiver for MAVERIX BROADBAND, INC., a Colorado corporation, as defined in the *Order Granting Verified Motion for Ex Parte Appointment of Receiver* dated January 22, 2026 in Case No. 2026CV30150, Denver District Court

Signed by:

By: ______________________________

E69134AAC4CD4CD...

Bryan Perkinson

**BUYER**

COOPERREILLY INVESTMENT FUND, LLC

a Georgia limited liability company

Signed by:

By: ______________________________

EE4872675E5741A...

D. Matthew Middelthon, Manager

Signature page to Asset Purchase Agreement

# SCHEDULE 1

## Permits

Docusign Envelope ID: A6FDF19A-34A2-4906-8D40-AF6EDCA56EC3



| Project Name | Jurisdiction | County | Description | Google Drive Link | Jira # | Date Submitted | Date Received | Permit # | Expiration Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| CPF 23' Chaffee Backbone - El Paso 1 South | El Paso County | El Paso County | From Elbert County Border to Hwy 24 & Peyton Hwy 41614 & 41615 extended 30 days signed and sent to Samantha on 8/20/24. | lders/1YEh4EoK-vknN5SCRsRuuoejv_GyGiVct?usp=drive_link | MXE238 | | 7/2/2024 | 41615 | 9/3/2024 | Work completed, hazardous conditions for restorations need to be completed before warranty period goes into effect. |
| Black Forest Estates | Douglas County | Douglas | Pothole permit | https://drive.google.com/drive/folders/1C68cM9kicXIxPgTlziMChVGqZGFrQdfJ?usp=drive_link | MXE-250 | | 8/23/2024 | 0824-0791-E | 10/22/2024 | Pothole permits - work not issued to construction pending field engineering as of 7-29 inspector updated on status of job 7-29-25 |
| CDOT 1 Hwy 86 - CPF Kiowa | CDOT | Elbert | Highwway 86 from CR17 and 86 east to border of town of Kiowa, and the from Water Tower to end of run east. Approx. 10kft. | lders/1FcD53m_bwl4HTSeFQwEmWgBp1ijdaPuK?usp=drive_link | MXE-263 | | 8/21/2024 | 4240349 | 12/20/2024 | 1 of 3. Amendment 1 submitted and approved. |
| CDOT 1 Hwy 86 - CPF Kiowa - Crossings Amendment 1 | CDOT | Elbert | Amendment for CPF Kiowa. | lders/1e0mnziTWvym1Zh5Psg39NF00CfhUfzan?usp=drive_link | MXE-258 | | 10/24/2024 | 4240349 | 12/20/2024 | 2 of 3. 1st amendment. |
| Elbert County Britanie Ridge Permit | Elbert County | ELBERT | Pines subdivision permit issued by Elbert County. | https://drive.google.com/drive/folders/1qvJjQ6I5_8UMi1OdD8unegKZVS9qgzZI?usp=drive_link | MXE-252 | | 3/26/2024 | RB-2024-00131 | 3/6/2025 | Expired. Unsure if work is completed. |
| Douglas County CR 166 / Delbert Rd HH Adjustment | Douglas County | Douglas | Moving existing HH at SW corner of Delbert/Singing Hills (CR 166) to the west. Moving HH on SW corner to the west for road improvements. | lders/1rv5LzcGnQTsGuzuvQcKjbEZ2WdGlQ8xe?usp=drive_link | MXE-578 | | 2/21/2025 | 0225-0139-E | 4/22/2025 | Work completed, permit needs closed out. |
| Renewal Permit - Black Forest Dr & E Whispering Pins Dr | Douglas County | Douglas | Pothole permit | https://drive.google.com/drive/folders/1C68cM9kicXIxPgTlziMChVGqZGFrQdfJ?usp=drive_link | MXE-499 | | 12/23/2024 | 0824-0791-E | 4/22/2025 | Pothole permits - work not issued to construction pending field engineering as of 7-29 inspector updated on status of job 7-29-25 |
| Elbert County Elizabeth to Falcon | Elbert County | Elbert | Fiber optic conduit and installation from the south side of Elizabeth all the way to the El Paso County border | lders/1DlnLxoKHDc_XfwZOhL3ibB8sMCoWU8BI?usp=drive_link | MXE-615 | | 6/17/2024 | RB-2024-00247 | 6/17/2025 | Per Angie 8-27 we will need to extend or resubmit permit for remaining work to complete 9-29-25 Steve to proof existing conduit needs our equipment to do so |
| Elizabeth Town Center Amendment - CR13 & 86 | CDOT | Elbert | Amendment for Elizabeth Town Center CDOT. 4230186 Highway 86 & Highway 13 crossing. | https://drive.google.com/drive/folders/1x5eD9ji7EIP7EUAledn9bDP5OVjqy9ol?usp=drive_link | MXE-243 | | 3/25/2025 | 4230186 | 7/25/2025 | Final extension they will give us, waiting on gas crossings and final work from Prodigy to be completed. See Jira f detailed notes. 8-18-25 construction complete - Angie emailed CDOT requesting meeting to discuss restoration plans. Meeting scheduled for 8-21-25 |
| NW Elizabeth Permit 1 | Elbert County | Elbert | NW Elizabeth South of Gamble Oaks | lders/1cygHNJbt4HD_iEqQSIFZXDcqe2-wBdTQ?usp=drive_link | MXE-236 | | 8/12/2024 | RB-2024-00319 | 8/30/2025 | Amendment to add section approved by inspector |
| Section 1.1 Franktown CDOT (East 86) | CDOT | Douglas | Section 1.1 on HWY 86 from Elbert and Douglas County border to Deerfield road crossing. Section 1 split into 1.1 and 1.2 to accommodate construction. | https://drive.google.com/drive/folders/1q1pe8wilKgy5f1p4IjPcWdudlITp47Lx?usp=drive_link | MXE-267 | | 11/8/2025 | 1240989 | 10/6/2025 | 2nd extension approved. Emailed Prodigy 8-18-25 requesting map to schedule traffic control and submit occupan report to CDOT 8-20 occupancy report sent to CDOT via email 8-27 Occupancy report sent to CDOT via emai occupancy report sent 9/3 , 9/10, 9/17 |
| Elbert County 2700 CR 158 and 3253 Crytal peak dr bore shots for drops | Elbert County | Elbert | Bore shot for drop to 2700 CR 158 and 3253 Crytal peak dr | https://drive.google.com/drive/folders/1CLEOkcUNVuHj8yv98ap5-yjwpwhLhCwn?usp=sharing | | 8-13-25 | 8-19-25 | RB-2025-00316 | 10-19-25 | |
| Section 8 Franktown Construction Permit | Douglas County | Douglas | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Hurlingham Circles, Hurlingham Way, Hurlingham Loop. | lders/1Mfd-mEo1rR842NZ0z_yCyKsOLQO7aSaS?usp=drive_link | MXE-241 | | 8-22 | 0525-0428-E | 10-21-25 | Pothole permit- sent to TRC 8-25-25 Pothole log sent from TRC 9-2-25 Follow up with Smoky Hill 9-4-25 pending payment before proceeding |
| Section 9 Franktown Construction Permit | Douglas County | Douglas | Installation of conduit, handholes, cabinets, flowerpots, etc. to house fiber optic cable on residential roads north of Hwy 86 to include: | lders/1xbTdczninrFhHg--59iNAAhiZE9yi9s2?usp=drive_link | MXE-239 | | 8-22 | 0525-0428-E | 10-21-25 | Pothole permit- sent to TRC 8-25-25 Pothole log sent from TRC 9-2-25 Follow up with Smoky Hill 9-4-25 pending payment before proceeding |
| Construction Permit 3 - Main St and Peyton Highway | El Paso County | El Paso County | 209 FT OF BORE PLACE 2 HANDHOLES | lders/1Hk0J0geCQblSxemGzQOZXSJuarUrYVqv?usp=drive_link | MXE 597 | | 10-22 | 43564 | 11-27 | |
| CDOT Elizabeth Town Center East - Casey Jones West | CDOT | Elbert | handholes, cabinets, flower pots, etc. as necessary on the north side of Highway 86 from County Road 17 to S Banner St. | https://drive.google.com/drive/folders/1QhB5gz1hJgkQt8ytdUYz2r3uIaltdCPg?usp=drive_link | MXE-255 | | 2/26/2025 | 4250066 | 11/30/2025 | 1 extension has been approved. Expiration date updated from 6/26 to 10/17 Extension request sent to CDOT 10-8-25 per CDOT this will be the final extension |
| Black Forest Estates Ammendment for Whispering Pines | Douglas County | Douglas | Pothole permit | https://drive.google.com/drive/folders/1C68cM9kicXIxPgTlziMChVGqZGFrQdfJ?usp=drive_link | MXE-248 | | 9/30/2024 | 0824-0791-E | 11-30 | Pothole permits - work not issued to construction pending field engineering as of 7-29 inspector updated on status of job 7-29-25 |
| 400 E Kiowa Ave | Elbert County | Elbert | 325 Of Bore | | | 10-15 | 10-16 | 25-04 | 11-30 | |
| Livermore P1 BAP | Larimer County | Larimer County | fiber optics. Then installing the fiber optics and restoring the work area to per the county rules & regulations. Install start at W County Road 74 E & Hwy 287, continues as CR | Larimer P1 BAP CPF | MXE-225 | | 10-27 | 25-ROW0314 | 12-05-25 | 11-12 requested extension for permit Larimer County asked for map and schedule of remaining work 11-13 sent over to Steve - water issues delaying work. followed up with Steve on map and schedule 12-3 |
| CDOT Hwy 24 CPF 23' Chaffee Excavation Permit | CDOT | El Paso | Install fiber handholes/cabinets/flower pots/etc. along HWY 24 from Falcon to Peyton in CDOT ROW. | lders/17-xm8BJYW6BDPTJSerBq82mdo3KykXqI?usp=drive_link | MXE-247 | | 2/24/2025 | 2240381 | 12/12/2025 | Sent permit extension request 8-22-25 Added permit to calendar with angie and steve 8-29 email to CDOT abo OCC report 9-24 sent occupancy info to CDOT 9-26 SENT OCC report 10-1 sent CDOT OCC report 10-8 followe up with Steve on status of work 12-3 sent email about extending permit to CDOT 12-8 |
| Section 4 Franktown CDOT (Hwy 86&83) | CDOT | Douglas | Hwy 86 & Hwy 83 Franktown (fire station and ZAO) | lders/1GwV7ZtANDBfRylM8q2pm8zd6CWkQhGml?usp=drive_link | MXE-235 | | 1/17/2025 | 1250040 | 12/22/2025 | extension request 8-18 follow up 8-21 |
| Elbert County CR 166 / Delbert Rd HH Adjustment | Elbert County | Elbert | Moving existing HH at SW corner of Delbert/Singing Hills (CR 166) to the west. Moving HH on SW corner to the west for road improvements. | https://drive.google.com/drive/folders/1642YepEiDi52FkeZpude3QeaZlxI5dIW?usp=drive_link | MXE-576 | | 3/3/2025 | RB-2025-00056 | 3/3/2026 | Work completed, permit needs closed out. |
| 2500 COUNTY RD 158 | ELBERT | ELBERT | 49FT OF BORE IN ROW FOR DROP TO 2500 COUNTY RD 158 | Elbert County Bore Shot- 2500 CR 158 | | 10-7 | 10-13 | RB-2025-00378 | 10-14-2026 | |
| MX 1 S Saguache | Sauache County | Saguache | Installing fiber from HWY285 East on CR CC to the homes around the intersection. CR EE & CR 59.5 | lders/1wslyBFTNNYP4WwWyu5Y-H4P23ncv2sjE?usp=drive_link | MXE-216 | | 12/12/2024 | 1087 | None | Does not expire until work is finished. |
| MX 2 South Mineral Hot Springs | Sauache County | Saguache | Installing fiber from HWY285 East on CR GG across CO 17 to CR 58EE. CR EE, and CR59.5 | https://drive.google.com/drive/folders/1lzktbsM_ldm4Jx3as5_YCOduBj1v3JBn?usp=drive_link | MXE-215 | | 12/12/2024 | 1088 | None | Does not expire until work is finished. |
| MX 3 North Mineral Hot Springs | Sauache County | Saguache | Installing fiber from HWY285 (CDOT Permit has been submitted) East on CR GG. CR GG, and CR59.5 | https://drive.google.com/drive/folders/1OnAwX2aB0rfB76CZnaly4QNjleWUrtHi?usp=drive_link | MXE-222 | | 12/12/2024 | 1089 | None | Does not expire until work is finished. |
| MX 4 Villa Grove | Sauache County | Saguache | Installing fiber in Villa Grove and from HWY285 West on CR LL56 to Bonanza. CR EE, and CR59.5 | lders/1pV7eL0K0Qjt2P1bAyOpycwN52Ly3-qDL?usp=drive_link | MXE-221 | | 12/12/2024 | 1090 | None | Does not expire until work is finished. |
| MX 5 Ewing Ranch | Sauache County | Saguache | Installing fiber from HWY 285 east on CR CC to the homes around the intersection of CO 17 & CR CC. Ewing Ranch Sub, Ewing Rd, Blackburn Dr, County Rd GG | https://drive.google.com/drive/folders/1rKTh3mAAu1VG9cLd3oPDwhKilektXfki?usp=drive_link | MXE-220 | | 12/12/2024 | 1091 | None | Does not expire until work is finished. |
| 285 CDOT Permit 5 - S Chaffee County to USFS | CDOT | Chaffee | Install fiber/handholes/pedestals/cabinets from South Chaffee County Border to USFS on Hwy 285. | | MXE-224 | | | | | Note from December: Status update: SUE C, Engineering tickets complete, Randall sent P&P, need to do fie engineering to figure out how we are going to navigate construction. Once Field Engineering is completed an updated P&P will be required. |
| BLM Saguache / Chaffee County | BLM | Chaffee | Saguache and Chaffee County. To include all areas around Highway 285, intersecting roadways, etc. This area will intersect with County ROW, CDOT ROW and | lders/1TDSAJEmBLYp6ZbNGnqpFAWOajRQAt49P?usp=drive_link | MXE-506 | | | | | Submitted to BLM via email, to Leon. Leon is working with the USFS to keep these coordinated. He will need t GIS maps we submit to the USFS as well to coordinate with them. He also needs to be notified when we submit w CDOT. All 3 entitites need to be kept in the loop when anything changes/updates with the others to coordinate |
| CPF Boulder County | Boulder County | Boulder County | | | MXE-618 | | | | | utilitypermit@bouldercounty.govor call 303-441-3900. sent email requesting information pertaining to permitting process 9-30 |

Exhibit 1

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CDOT 1 Hwy 86 - CPF Kiowa - Crossings Amendment 2 | CDOT | Elbert | Moving HH located on SW corner of Hwy 86 & Hwy 21 to the SE corner. Was designed to be placed in a ditch on accident. | | MXE-630 | | | 4240349 | | 2 of 3. 2nd Amendment to be submitted to CDOT. Unsure about exact status of this permit. |
| 285 CDOT Permit 7 - N Edge of PSINF to S Edge of Poncha Springs | CDOT | Saguache & Chaffee | Fiber installation N edge of PSINF to S edge of Poncho Springs. | | MXE-213 | | | | | P&P status is drafting - is Randall working on this? No notes or attachments. |
| 285 CDOT Permit 4 - Villa Grove to Chaffee County Line | CDOT | Saguache & Chaffee | Installing duct and handholes for fiber optics along 285 from Villa Grove to the Chaffee County Border. | lders/1v-euo8GtiZaGlvDD9DUpHcC5uEuymPYM?usp=drive_link | MXE-230 | | | | | Submitted updated P&P, no response from Diane since 4/22/25. **MUST BE RESUBMITTED VIA LESLIE** Need to be kept in coordination with the USFS portion and the BLM. |
| 285 CDOT Permit 3 - Saguache EOT to S Villa Grove | CDOT | Saguache & Chaffee | Fiber installation along 285 from Pitkin ave North East to Municipality border. | lders/1Kktcc_hw6lHLhdFw8lkVPbSHlaDGDY7V?usp=drive_link | MXE-231 | | | | | Submitted updated P&P, no response from Diane since 4/22/25. **MUST BE RESUBMITTED VIA LESLIE** Need to be kept in coordination with the USFS portion and the BLM. |
| CDOT HWY 285 Access Permit | CDOT | Saguache & Chaffee | Access permit for SUE A surveying on Hwy 285 submitted 10-14-25 | | | 10-14 | | SUBMITTED | | SUE A 10-17 Permit Submitted status Followed up on application w CDOT 10-20 Follow up 10-27 Follow up 11-3 Diane said she was busy and app is in her queue for review Still in submitted Status on portal 11-10-25 |
| 004 HWY 285 CDOT USFS Pike San Isabell NF - Chaffee County | CDOT | Chaffee | Install fiber/handholes/pedestals/cabinets in colocatoin with CDOT ROW on Hwy 285 in Saguache and Chaffee Counties inside of Pike San Isabell NF. | lders/140gdACHImBA_HtKYAgP_Afbg8bH3MX0w?usp=drive_link | MXE-254 MXE-531 | | | | | Waiting on colocation approval from CDOT to submit as well. Keep this in coordination with the CDOT 285 permi & the BLM permit 7-24 Angie requested a colocation letter from CDOT for USFS Diane from CDOT to send letter. 7 -31 followed up with Janell with USFS to see if letter was recieved from CDOT 7-31 Communication from CDOT |
| CDOT Section 1.2 Franktown Construction Permit | CDOT | Douglas County | | | MXE-636 | | | | | On hold - piece that was removed from design per Dave/Ben. Unsure if this will be built. |
| Section 1 Franktown Construction Permit | Douglas County | Douglas County | Install fiber/handholes/pedestals/cabinets on the north side of Hwy 86 on Rocky Cliff Trail, North Bluff Dr, E Camelot Dr. | lders/1wRKQbnpKG4gr0EOU8ghOUoZEadAGpGuP?usp=drive_link | MXE-266 | | | | | Ready for submittal. |
| Section 2 Franktown Construction Permit | Douglas County | Douglas County | | lders/1fqYWQiZMz4iQY9ks3KUVuckB_-scAhBT?usp=drive_link | MXE-265 | | | | | In MX Review - submitted by Randall to DC, however, Ben/Jimmy needed to get FE completed to resend to Randall for resubmission. Initial review fee for plan and profile has not been paid |
| Section 3 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Burnt Oak Dr, Burnt Oak Tree Trl, Burnt Oak Trl, Burning Ridge, Cedar Cr, Burning Tree Dr, | https://drive.google.com/drive/folders/1e6mJeUVgqVLuIlnvrlsT6GWcQ7lvts_T?usp=drive_link | MXE-264 | | | | | Ready for submittal, needs TCP. Emailed Dougco inquiring on what is at risk of resubmittal 9-18 |
| Section 4 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Burning Tree Dr, Kelty Trail, Trails End, Kelty Court, | lders/1g9Y_aesCp-87awUe_F5kUUUMYyM70w1F?usp=drive_link | MXE-234 | | | | | Ready for submittal, needs TCP. Emailed Dougco inquiring on what is at risk of resubmittal 9-18 |
| Section 5 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Flintwood Rd, E Grant Rd, Duffy Ln, holmes Rd, E Folsom point Ln | lders/1ly0N4U0P2KqQQPT82KegWxjGZbKY0zil?usp=drive_link | MXE-233 | | | | | Ready for submittal, needs TCP. Emailed Dougco inquiring on what is at risk of resubmittal 9-18 |
| Section 6 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Bayou Gulh Rd, E Bayou Hill Ln, Palmer Ridge Dr, North Bayou Hills Rd, Desert Paint | lders/13T93kDdFq6BhlbMl9QX3prH9goXMveVF?usp=drive_link | MXE-245 | | | | | Ready for submittal, needs TCP. Emailed Dougco inquiring on what is at risk of resubmittal 9-18 |
| Section 7 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: E Tanglewood Rd, N Frontier Ln, Deerpath Tr, Holden Circle, Duffy Ln. | lders/1iSIT6T1Jh0KO4H_rEZTwT3rGbd4sEDry?usp=drive_link | MXE-244 | | | | | -Last note: Need to do SUE B from December. 8-19-25 nothing in folder |
| Section 8 Franktown Construction Permit | Douglas County | Douglas County | etc. to house fiber optic cable on residential roads north of Hwy 86 to include: Hurlingham Circles, Hurlingham Way, Hurlingham Loop. | lders/1Mfd-mEo1rR842NZ0z_yCyKsOLQO7aSaS?usp=drive_link | MXE-241 | | | | | Sent pothole permit to TRC 8-25-25 Pothole log sent from TRC to Randall and Fred 9-2-25 |
| Section 9 Franktown Construction Permit | Douglas County | Douglas County | Installation of conduit, handholes, cabinets, flowerpots, etc. to house fiber optic cable on residential roads north of Hwy 86 to include: | lders/1xbTdcznirrFhHg--59iNAAhiZE9yi9s2?usp=drive_link | MXE-239 | | | | | Sent pothole permit to TRC 8-25-25 Pothole log sent from TRC to Randall and Fred 9-2-25 |
| Section 10 Franktown Construction Permit | Douglas County | Douglas County | | https://drive.google.com/drive/folders/1djwzTA7jgzIQ4d7C4AqFs1bbEyskT8uw?usp=drive_link | MXE-251 | | | | | Fred to finish this up after Section 11, Randall needs survey info to draft. |
| Section 11 Franktown Construction Permit | Douglas County | Douglas County | | lders/1YguHgFICD7cTJKXaDRS7PhcEbqzRmqHl?usp=drive_link | MXE-249 | | | | | Plan submittal 5-14-25.Comments from DC received, sent to Randall. Pending additional survey work from Fred needs GPS to get it completed. Waiting to get his program renewed. |
| Section 13 Franktown Construction Permit | Douglas County | Douglas County | | lders/1K2XxGAc980ANpsnK4nT4H1Sq-F1zY6op?usp=drive_link | MXE-584 | | | | | |
| Section 14 Franktown Construction Permit | Douglas County | Douglas County | | lders/1ph-RbQPHHH1x3t135chSjpfAzhP_AR3w?usp=drive_link | MXE-586 | | | | | |
| Douglas County Blanket / Small Utility GESC Permit | Douglas County | Douglas County | Blanket permit for projects under 1000ft to be performed under if the work meeets guidelines | | | | | | | 8-14-25 Inquired with the County if Maverix had a blanket / annual permit county said we do not Jacob from development review sent over the guidelines for a small utility GESC permit sent over to Angie for review 8-14 |
| Flintwood DC Site 5 Part 1 and part 2 | Douglas County | Douglas County | neighborhood of windy hills aka tomahawk or flintwood | | | | | | | |
| CDOT Section 11 Franktown Construction Permit | ELBERT | ELBERT | | lders/1G8yn_Wqi9CRaW1KEJfq8ae8_QZsM9vof?usp=drive_link | MXE-501 | | | | | Need an update from Randall. |
| CDOT HWY 72 | ELBERT | ELBERT | 72 from approx MP 7.5 to HWY 93. Railroad crossing taking place just before HWY 93 will be in a separate permit | lders/1kejNUU4vvVLPV9qcZnJ3tpnxX0qXdY6Y?usp=drive_link | MXE-240 | | | | | On hold - potholing in progress, haulted due to rock and terrain. See Jira P&P for detailed notes. |
| CDOT Livermore Hwy 287 | ELBERT | ELBERT | SURVEY PERMIT | https://drive.google.com/drive/folders/1E_7OvhiRH0ArbjJclaQ7aK7T9Z0dxKoZ?usp=drive_link | MXE-232 | 12-8 | | SUBMITTED | | |
| CPF Kiowa - Elbert County 1 | ELBERT | ELBERT | | https://drive.google.com/drive/folders/1nAkzFqMclCiNlsfy9rdOBctGrRIEktoa?usp=drive_link | MXE-237 | | | | | Angie is looking into this one to confirm what area this is for. No description, notes or attachments. Unsure of what this area is for and where the permit is located. Tied to Town of Kiowa litigation issues |
| Town of Kiowa | ELBERT | ELBERT | | lders/1mZ1jAnnm0GHLES3W1bEsF_9_b5ec5RKk?usp=drive_link | MXE-226 | | | | | In litigation, on hold until further notice- need documents when we are ready to move on this one. |
| CDOT 2 Kiowa Town Center - CPF Kiow | ELBERT | ELBERT | | lders/1T3jdV_05cG5d3AFUq6mJODMicYjJllqd?usp=drive_link | MXE-257 | | | | | No supporting docs in folder 8-5-25 |
| 285 CDOT Permit 2 - Town of Saguache | ELBERT | ELBERT | Fiber installation along 285 from Pitkin ave North East to Municipality border. | https://drive.google.com/drive/folders/1tBBeQfytkDMZKSIpCDvl1OGzflW2Ld7-?usp=drive_link | MXE-229 | | | | | -Last note: Need to do SUE B from December. 8-19-25 nothing in folder |
| NW Elizabeth Permit 2 | ELBERT | ELBERT | | https://drive.google.com/drive/folders/1rbDftb_FS8CfcHN09eSimcGri6CpxAS?usp=drive_link | MXE-228 | | | | | Designed, waiting for Permit 1 area to be finished to apply for 2 &3. NO FILES IN FOLDER 8-1-25 |
| NW Elizabeth Permit 3 | ELBERT | ELBERT | | lders/1QGU5xbxMSwGwp8OlhhT3NO79ZWzTf4zY?usp=drive_link | MXE-227 | | | | | Designed, waiting for Permit 1 area to be finished to apply for 2 &3. NO FILES IN FOLDER 8-1-25 |
| Fern Road - Elbert County Listed Address 40089 County Rd 13 | ELBERT | ELBERT | Fern Rd, Margaret Dr off of Hwy 13. | lders/1WmZBmglRXqcK0i_EFoYPpvc0oKeVh9UU?usp=drive_link | MXE-707 | | | | | Per Angie EC wont issue permits until NW Elizabeth is complete as of 7-30 tenative start date of 9-2 Submitted t Elbert County 8-20-25 Jay requested fees sheet to be filled out sent back to jay via email 8-21-25 NEED TO RESUBMIT FEE SHEET TO JAY PER HIS REQUEST 8-22 |

Exhibit 1

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CR 17 and E Kiowa Ave | Elbert County | Elbert | 112 bore shot across cr 17 | | | | | | | Followed up 10-22 Work may already be complete. |
| CPF Gilpin County | Gilpin | Gilpin | | | MXE-618 | | | | | Research in progress, project name may change. Research so far located in Google Drive. 9-25 reach out Gilpin to schedule meeting 9-30 Contacted Travis with United Power 10-1 United Power sent over permit application and application process 10-1 |
| Kinder Morgan | Kinder Morgan | | Gas Line Crossing Section of Section 8 | | | | | | | App sent over from Kinder Morgan 9-3 Ben advised to prep app for submittal |
| Livermore Permit 2 | Larimer County | Larimer County | 20637ft of bore 45902 of plow 73 hh | lders/1ujO-DZv7UpWAx8Q3G2HPFNlppozldQrB?usp=drive_link | | 10-20 | | SUBMITTED | | Followed up with Larimer County on application submittal fyi 10-21-25 per pre con 10-22 county would pref applying prior to work starting on second permit 10-24 Tina requested PDF to determine if floodplain permit is needed sent over to county 10-28 and uploaded to portal 10-28 11-5 Pemrit ready for payment |
| Larimer County Permit 1 Floodplain Permit | Larimer County | Larimer County | path crosses two floodplains on N. CR 37 and once on 74E. | | | | | | | Sent PDF map for work under permit application 25-ROW0335 to Tina and Ken for review if floodplain permit needed 10-28 uploaded map to online portal app 10-28 11-3-25 Email sent to ACOE requesting permitting requirements 11-4 ACOE confirmed no permit needed to from ACOE Emailed Tina @ Larimer County 11-4 asking |
| State Land Board Permit - Larimer County | State Land Board | Larimer County | Larimer County - State Land Board permit. Small pieces of land across N CR 37 just north of Red Feather Lakes Rd/CR W 74e. | lders/1E4n_UqIcJCcHq2D5jY4ng2sSXHcGtYgs?usp=drive_link | MXE-583 | | | | | Received documentation and information about submitting the permit process. 1st step is to set up a meeting wi them. Emails/info saved in folder on Google Drive. Ben reach out 10-1 10-7 SLB requested SHP files and footage information follow up with Ben about information 10-14 -10-17 sent requested information back to David at SLB |
| W Boulder St and S Jefferson St | Town of Nederland | Town of Nederland | 11696 of bore 43 vaults | lders/16ztVC9MWm8AxJhEE0ebRNw8aiDVjK2wE?usp=drive_link | | | 10-6 | NO PERMIT NUMBER | | Permit Recieved 10-6-25. No Permit Number for reference as of 10-14 project is on hold pending a feasibility walkout emailed Brittany with town of Nederland with update 10-14 |
| USFS Pike San Isabell NF - Chaffee County | USFS | Chaffee | | USFS | MXE-532 | 10-23-2025 | | SUBMITTED | | Waiting on colocation approval from CDOT to submit as well. Keep this in coordination with the CDOT 285 permi & the BLM permit 7-24 Angie requested a colocation letter from CDOT for USFS Diane from CDOT to send letter. 7 -31 followed up with Janell with USFS to see if letter was recieved from CDOT 7-31 Communication from CDOT |
| USFS- Rio Grande National Forest | USFS | Saguache | | USFS- Rio Grande National Forest | | | | | | Sent docs to Janell for review and comment - 11-13-25 Follow up with Janell on documents sent over 11-17 11-1 Janell said it was in her queue for review hoping to be completed by the end of this week 11-24 Janell requested name revisions |
| Union Pacific HWY 72 RR Crossing | | | | lders/1DhYc_U14NP8B1wdzDRryVnjFbNJjzxSo?usp=drive_link | MXE-242 | | | | | On hold - unsure if this will be built. See Jira for detailed notes. |
| Forests and Pawnee National Grassland | | Larimer | | | | | | | | |

Exhibit 1

# SCHEDULE 2

## Assumed Contracts and Assumed Leases

- Lease for the NOC cabinet at 910 15th Street, Denver, CO 80202
- Lease with Tommy Thrasher, Sr. for the storage yard at 1490 CR 186, Parker, CO 80138
- Lease with David Lindaur to access telecommunications equipment on his property
- Lease with Tyler Bartholomew to access telecommunications equipment on his property
- License with Viath, Inc. (or any other party) to the CRM
- All fiber leases necessary to operate the Non-Grant Network, including, without limitation, Zayo Orders No. 2360185, 2369373, 2358865, 2260272, 2351781

# SCHEDULE 3

## Equipment

| Year | Make | Model | Serial/VIN | Description |
|---|---|---|---|---|
| 2017 | Vermeer | PTX40 (Remote) | 1VR8072T2H1000168 | Vibratory plow |
| 2022 | Vermeer | PTX42 (Walk Along) | 1VRK0724CM1000171 | Vibratory plow |
| 2021 | Vermeer | PTX44 (Sit Down) | 1VR8072SPM1001574 | Vibratory plow |
| 2020 | Bobcat | E-35 | B3WZ15212 | Mini excavator |
| 2021 | Bobcat | T-76 | B4CE16533 | Skid steer |
| 2014 | Atlas | XAS185 | HOP044401 | Air compressor |
| Unknown | Unknown | Unknown | Unknown | Hydrovac/pothole cleaner |
| 2022 | Vermeer | D8x12 Navigator | Unknown | Drill/boring |

# EXHIBIT A

**Bidding Procedures**

TO INTERESTED PARTIES:

Maverix LLC and Maverix Broadband, Inc. (together, "**Borrowers**") are offering interested parties the opportunity to pursue an acquisition (a "**Transaction**") of some or all of their business and/or assets (the "**Assets**"). The bid procedures below (the "**Bid Procedures**") set forth the process by which Borrowers, in consultation with their secured lender, CooperReilly Investment Fund, LLC ("**Lender**"), will solicit and evaluate bids for the acquisition of the Assets.

Borrowers have hired Hadley Ford of Griscom Advisors ("**Griscom**") to market and alert potentially interested parties of the opportunity to purchase the Assets pursuant to a Transaction. Griscom, in consultation with Borrowers and Lender, shall oversee the marketing, bidding, and Transaction process.

**Important Dates**

| Event or Deadline | Date and Time |
|---|---|
| Stalking Horse Selection Deadline | November 12, 2025 |
| Bid Deadline | December 5, 2025 at 4:00 PM MT |
| Auction (If Applicable) | December 12, 2025 at 10:00 AM MT |

**Marketing Process**

Contact Parties. Borrowers have developed a list of parties which they believe may be interested in consummating, and which they reasonably believe would have the financial resources to consummate, a Transaction. Borrowers shall distribute to each such party and any other interested party or potential bidder (the "**Potential Bidders**") an "Information Package" consisting of (i) these Bid Procedures; (ii) a form confidentiality agreement on terms acceptable to Borrowers; and (iii) any other materials as may be appropriate under the circumstances.

Participation Requirements and Initial Diligence. To receive due diligence information, including full access to Borrowers' electronic data room and to additional non-public information regarding Borrowers, a Potential Bidder must deliver the following documents (collectively, the "**Preliminary Bid Documents**") by email to each of the Notice Parties (as defined below):

1. An executed confidentiality agreement on terms acceptable to Borrowers, to the extent not already executed;

2. The identity of the Potential Bidder and a list of contacts for the Potential Bidder;

3. A description of the diligence the Potential Bidder seeks to conduct; and

4. Evidence by the Potential Bidder of its financial capacity to close a proposed Transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of consummating a Transaction, the party that will bear liability for a breach).



Exhibit 1

Promptly after a Potential Bidder delivers Preliminary Bid Documents to the Notice Parties, Borrowers, in consultation with Lender, will assess the adequacy of the evidence of its financial capacity and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit a bid and participate in the Auction (as defined below), as applicable. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, a "**Bidder**") may submit bids or other offers; *provided, however,* that Borrowers, in its reasonable discretion, after consultation with Lender, may agree to waive some or all of the Potential Bidder requirements set forth herein. Borrowers reserve the right to work with any Potential Bidder to cure any deficiencies in the Preliminary Bid Documents. As soon as reasonably practicable after Borrowers, in consultation with Lender, determines that a Potential Bidder is a Bidder, Borrowers will provide such Bidder with access to an electronic data room and due diligence information as reasonably requested by such Bidder and as made available to any other Bidder (to the extent such Bidder has not already been provided such access and information). All substantive direct communications, including any due diligence requests, with Bidders and Qualified Bidders (as defined below) shall be through and directed to Griscom (by email is sufficient) (see contact information below). Grisom will work to facilitate any site visits and meetings between any interested Bidder and the Borrowers' management team. For all Bidders, the due diligence period will end on the Bid Deadline (as defined below), and after the Bid Deadline, Borrowers will have no obligation to furnish any due diligence information.

Borrowers will coordinate all reasonable requests from Bidders for additional information and due diligence access. Borrowers, in consultation with Lender, may decline to provide such information to Bidders who, in Borrowers' business judgment, have not established, or who have raised doubt, that such Bidder intends to act in good faith or has the capacity to consummate a Transaction.

For any Bidder who is a competitor of Borrowers or is affiliated with any competitor of Borrowers, Borrowers reserves the right to withhold, in consultation with Lender, any diligence materials that Borrowers determine are business-sensitive or otherwise inappropriate for disclosure to such Bidder at such time.

Each Bidder shall comply with all reasonable requests for additional information and due diligence access by Borrowers or its advisors regarding such Bidder and its contemplated Transaction.

**Stalking Horse**

Borrowers, in consultation with Lender, may elect to select a bid that shall serve as the minimum bid for the Assets or any portion thereof (such bidder, a "**Stalking Horse Bidder**," and such bid, a "**Stalking Horse Bid**") and Borrowers shall enter into the transaction contemplated by the Stalking Horse Bid unless a higher Qualified Bid is submitted with respect to the Assets. In order to incentivize prospective purchasers to agree to become a Stalking Horse Bidder, Borrowers reserve the right, in consultation with Lender, to offer the bid protections to such Stalking Horse Bidder, payable if Borrowers consummate a sale pursuant to a Qualified Bid other than the Stalking Horse Bid (if the Assets subject to the sale include those to which such Stalking Horse Bid relates): (a) payment of a break-up fee as agreed to by Borrowers and the Stalking Horse bidder, and (b)

expense reimbursement of the reasonable and documented fees and expenses of the Stalking Horse Bidder up to an amount certain.

**Bid Deadline**

The deadline for any Bidders to submit bids, shall be December 5, 2025 at 4:00 PM MT (the "**Bid Deadline**"). Bids must be received on or before the Bid Deadline by the following parties (collectively, the "**Notice Parties**"):

1. Borrowers: Tyler Bartholomew, President, tyler@maverixbroadband.com

2. Griscom: Hadley Ford, hadley.ford@griscomadvisors.com

Within one day of receipt, Borrowers will provide copies of any bids received to Lender and counsel to Lender.

**Bid Requirements**

To be eligible to participate in the Auction (as defined below), each bid and each Bidder submitting such a bid must conform to the following requirements (collectively, the "**Participation Requirements**"):

1. A purchase agreement;

2. A statement that there are no conditions precedent to the Bidder's ability to enter into the proposed Trasaction or other definitive documentation, including that there are no financing or diligence contingencies to the bid, and that all necessary internal approvals have been obtained prior to the bid;

3. A written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder (as defined below) in the event that such Potential Bidder's bid is not selected as the Successful Bid;

4. A statement that such offer is binding and irrevocable unless designated as the Back-Up Bid, provided that if such offer is selected as a Successful Bid (as defined below) or a Back-Up Bid, then the offer shall remain binding and irrevocable until three (3) business days after the closing of the transaction with the Successful Bidder or the Back-Up Bidder, as applicable (and any interest on funds while in escrow will follow the deposit, so that the party with the Back-Up Bid shall receive interest on any funds that are returned to it);

5. Disclosure of the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

6. Disclosure of the Bidder's affiliations;

7. The names and contact information of members of the Bidder who will be available to answer questions regarding the offer, including advisors and related parties;

8. A good-faith deposit in immediately available funds of at least ten percent (10%) of the cash purchase price set forth in the bid (the "**Good Faith Deposit**");

9. Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Transaction;

10. Identify each regulatory and third-party approval required for the Bidder to consummate the Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals;

11. Represent and warrant that the Bidder has had an opportunity to conduct any and all due diligence regarding the Assets prior to submitting its bid and a statement that the Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding Borrowers' business or the Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Bidder's purchase agreement, ultimately accepted and executed by Borrowers;

12. Disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by Borrowers, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. By submitting its Bid, each Bidder agrees to refrain from and waive any assertion or request for reimbursement on any basis. This paragraph shall not apply to any Stalking Horse Bidder.

Borrowers, in consultation with Lender, shall determine whether bids submitted by Bidders meet the Participation Requirements. Borrowers reserves the right to request additional information from a Bidder in connection with its bid.

### Qualified Bidders and Bids

Bidders who have satisfied the Participation Requirements, as determined by Borrowers, in consultation with Lender, and any Stalking Horse Bidder will be deemed "**Qualified Bidders**." Bids that contain all bid requirements, as determined by Borrowers, in consultation with Lender, will be deemed "**Qualified Bids**."

Borrowers will advise each Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction. Borrowers will provide copies of the Qualified Bids to Lender and Lender's counsel.

Borrowers, after consulting with Lender, reserves the right to waive noncompliance with any one or more of the Participation Requirements to be a Qualified Bid and deem an otherwise not Qualified Bid to be a Qualified Bid if they reasonably determine, in their business judgment, that such waiver is consistent with their fiduciary duties.

Lender reserves its right to submit a credit bid for the Assets at any time prior to the commencement of the Auction. If Lender submits a credit bid, Lender shall be deemed a Qualified Bidder, and its bid will be deemed a Qualified Bid in all respects. In the event Lender submits a credit bid, it shall immediately no longer have any consultation or related information rights otherwise set forth herein.

All Qualified Bidders (except for any Stalking Horse Bidder) shall be deemed to have waived any right to assert, pursue, or receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction, or the Transaction.

**Auction Participation**

Unless otherwise agreed to by Borrowers, in consultation with Lender, only Qualified Bidders and their respective legal or financial professionals are eligible to attend or, with respect to Qualified Bidders, participate at the Auction. Subject to the other provisions of these Bid Procedures, if Borrowers do not receive any Qualified Bids, or if no Qualified Bidder has indicated its intent to participate in the Auction, Borrowers will not hold an Auction.

**Auction**

If more than one Qualified Bid has been received and any Qualified Bidder has indicated its intent to participate in the Auction, Borrowers will conduct an auction (the "**Auction**"). Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transaction.

The Auction shall take place on December 12, 2025 at 10:00 AM MT at Markus Williams Young & Hunsicker LLC, 1775 Sherman Street, Suite 1950, Denver, Colorado 80203. As soon as practical prior to the Auction, Borrowers will provide notice of any change to the Auction location to all Qualified Bidders.

Before the Auction, Borrowers will determine, in consultation with Lender, which Qualified Bid constitutes the highest or otherwise best offer (the "**Starting Bid**"). Borrowers will provide copies of all Qualified Bids, including the Starting Bid, to Qualified Bidders who are eligible to attend and participate in the Auction.

Bidding at the Auction shall begin with the Starting Bid. At the Auction, only Qualified Bidders will be permitted to increase and/or improve their bids. The bidding shall be in minimum increments of at least $100,000 higher than the previous bid or bids (after giving effect to the minimum required for each bid to be determined to be a Minimum Qualified Bid). Subject to modification of the Bid Procedures as set forth herein, the Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids with full knowledge and written confirmation of

the then-existing highest or otherwise best bid or bids. Otherwise, Borrowers may conduct the Auction in any manner it reasonably determines, in its business judgment, after consultation with Lender, will achieve the highest or otherwise best offer.

**Closing the Auction**

The Auction shall continue until there is only one offer that Borrowers determine, following consultation with Lender, is the highest or otherwise best offer from among the Qualified Bidders submitted at the Auction (the "**Successful Bid**"). The Qualified Bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of a purchaser, as set forth in the respective agreement as such may have been modified during the Auction, as applicable. Prior to the conclusion of the Auction, after consultation with Lender, Borrowers shall (1) review each bid made at the Auction; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

Borrowers shall also, following consultation with Lender, select a back-up bid (the "**Back-Up Bid**," and such Bidder, the "**Back-Up Bidder**"), which shall remain binding and irrevocable for a period of sixty (60) days following the Auction. If, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, Borrowers may elect to regard the Back-Up Bid as the highest or otherwise bid, and Borrowers shall consummate the transaction contemplated by the Back-Up Bid.

Once selected, the Successful Bidder and the Back-Up Bidder shall increase the amount of its Good Faith Deposit to ten percent (10%) of the cash purchase price of the Successful Bid and the Back-Up Bid, respectively.

**Return of Good Faith Deposits**

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest bearing escrow accounts. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Back-Up Bidder shall be returned to such Qualified Bidder not later than two (2) business days following the Auction. Upon the return of the Good Faith Deposits, the respective Qualified Bidder shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning Transaction, its Good Faith Deposit shall be credited towards its purchase price. The Good Faith Deposit of the Back-Up Bidder shall be returned not later than two (2) business days after the closing of the Successful Bid.

**Reservation of Rights**

BORROWERS, IN CONSULTATION WITH LENDER, RESERVE THEIR RIGHT TO (I) MODIFY THE NON-MATERIAL TERMS OF THESE BID PROCEDURES IN ANY MANNER THAT WILL BEST PROMOTE THE GOALS OF THE BIDDING PROCESS AND TO IMPOSE, AT OR PRIOR TO THE AUCTION, ADDITIONAL OR DIFFERENT CUSTOMARY TERMS AND CONDITIONS, INCLUDING, WITHOUT LIMITATION, MODIFYING THE REQUIREMENTS FOR A QUALIFIED BID, MODIFYING BID INCREMENTS, AND MODIFYING THE ADMINISTRATION OF THE AUCTION, (II)

EXTEND THE DEADLINES SET FORTH IN THESE BID PROCEDURES, (III) ADJOURN THE AUCTION AT OR PRIOR TO THE AUCTION, AND (IV) REJECT ANY OR ALL QUALIFIED BIDS IF BORROWERS DETERMINE, IN THEIR REASONABLE, GOOD-FAITH BUSINESS JUDGMENT, THAT SUCH QUALIFIED BID IS INADEQUATE OR INSUFFICIENT. BORROWERS RESERVE THE RIGHT, AT ANY TIME, FOR ANY REASON AND IN ITS REASONABLE, GOOD-FAITH BUSINESS JUDGMENT, IN CONSULTATION WITH LENDER, TO DECLINE TO PURSUE THE TRANSACTION.