**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | Case No. 26-16423-MER |
| | ) | |
| MAVERIX, LLC | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| ______________________________________ | ) | |
| | ) | |
| COOPERREILLY INVESTMENT FUND, LLC, | ) | Adv. Pro No. 26-01240-MER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MAVERIX, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER AND COUNTERCLAIMS

## I. Answer to Complaint

Defendant Maverix LLC (the **Debtor** or **Maverix**), presently acting as debtor in possession, answers the Complaint of CooperReilly Investment Fund, LLC (**CR**) as follows. Paragraph numbers in this section correspond to the Complaint.

### Jurisdiction, Venue, and Parties

1. Admit that CR seeks declaratory relief concerning the extent of interests in property. Deny that CR is entitled to its requested relief.

2. Admit.

3. Admit.

4. Admit that CR states that it consents to entry of final orders and judgments.

5. Maverix consents to entry of final orders or judgment by the bankruptcy court to the extent consent is required.

6. Admit that Maverix is a Colorado limited liability company and that its voluntary Chapter 11 petition was docketed on August 31, 2026. Maverix alleges in the alternative that the petition was legally filed on August 30, 2026, if the evidence concerning its transmission and receipt establishes an effective filing on that date under applicable law. Maverix does not presently have complete information sufficient to resolve the legally operative filing date and time.

7. Admit that CR asserts interests adverse to Maverix concerning the disputed assets. Deny any implication that CR's asserted ownership or lien rights are established, or allowed by the bankruptcy code, merely by the allegations of the Complaint.

**Loan, Forbearance, and Receivership Allegations**

8. Admit.

9. Deny.

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit.

15. Debtor has insufficient information to admit or deny, therefore deny.

16. Admit.

17. Admit.

18. Admit, but only to the extent the written document speaks for itself.

19. Admit.

20. Not enough information to admit or deny, therefore deny.

21. Admit.

22. Admit, but only to the extent the agreement speaks for itself.

23. Not enough information to admit or deny, therefore deny.

24. Deny. Under the Bid Procedures, whether a bid was a Qualified Bid was "as determined by Borrowers, in consultation with Lender." By the December 5, 2025 deadline Visionary Communications, LLC delivered an asset purchase agreement on its $13,100,000 cash letter of intent, which paid CR in full at closing.

25. Not enough information to admit or deny, therefore deny.

26. Deny. On December 12, 2025, the Borrowers did not refuse the Sale Process; they invoked Article 3 of the Second Forbearance Agreement and asked CR to consider a good-faith postponement for Visionary Communications, LLC's $13,100,000 cash transaction, which would have paid CR in full at closing, and exercised the Borrowers' rights reserved in the Bid Procedures.

27. Admit, but only to the extent the document speaks for itself.

28. Admit.

29. Admit.

30. Admit.

31. Admit.

32. Admit that the appointment order defines the receiver's authority. Deny that the order authorized unlimited dispositions of Maverix's property or every provision later included in the executed IRU.

**Approval, Closing, and Ownership Allegations**

33. Admit.

34. Admit that the APA defines Acquired Assets and Excluded Assets. Deny that the later IRU's description of Covered Assets necessarily corresponds to the scope of rights authorized by the approved APA. The IRU far exceeds the scope of what Denver District Court approved.

35. Admit that the state court held a hearing on August 27, 2026.

36. Admit that the state court entered an order approving and authorizing consummation of the APA on August 28, 2026.

37. Admit that paragraph 3 of that order authorizes sale of Acquired Assets excluding Excluded Assets, necessary ancillary documents, and performance under the APA. Deny that this constitutes unlimited authority to enlarge the approved transaction.

38. Deny. The sale did not close on August 28, 2026, and the conditions to Closing did not occur: (a) APA § 3.1(a) makes the Closing Date "effective 12:00 a.m. prevailing Mountain time" on the date of Closing, and the Sale Order was not entered until 2:26 p.m. on August 28, 2026 (Docket No. 51-3 at 1); (b) CR signed at 3:23 p.m. Mountain time and gave notice of closing by email at 5:47 p.m. Mountain time, after 5:00 p.m. EDT, so under APA § 9.4 the notice is deemed given on the next Business Day, Monday, August 31, 2026; (c) no W-9 for Maverix LLC was delivered, although APA § 3.1(b)(ii) requires one "for each Seller"; (d) no evidence of the FCC and PUC approvals required by APA § 3.1(b)(iii) was delivered; and (e) no certificate "of an executive officer of each Seller" required by APA § 7.1(c) was delivered. Maverix disputes that the sale legally closed on August 28, 2026, because the required closing deliveries and conditions were not completed, satisfied, or validly waived before the asserted closing. Whether any condition was subject to waiver, or validly waived, and whether the required regulatory approvals applied

to the particular interests transferred remain matters for determination from the governing documents and evidence.

39. Admit that the bill of sale bears a stated effective date of August 28, 2026 and a receiver signature. Deny that the copy supplied establishes the actual signing or delivery date.

40. Admit that CR relies on an IRU associated with the transaction. Deny that the supplied documents establish execution and delivery on August 28, 2026 or that all rights asserted under the IRU were authorized.

41. Deny that CR acquired all disputed rights and interests on August 28, 2026 as alleged.

42. Deny that Maverix's estate consists solely of the identified real property.

43. Admit that the petition was docketed on August 31, 2026. Maverix alleges in the alternative that the petition was legally filed on August 30, 2026, if the evidence concerning its transmission and receipt establishes an effective filing on that date under applicable law. Maverix does not presently have complete information sufficient to resolve the legally operative filing date and time. Deny that the sale closed before the legally effective commencement of this case, and deny the remaining allegations.

44. Admit that Maverix asserts interests in the disputed assets.

**Claim for Declaratory Relief**

45. Maverix repeats its responses to paragraphs 1–44 as its response to their incorporation.

46. Deny.

47. Admit that § 541(a) governs the composition of the bankruptcy estate and includes the debtor's petition-date legal and equitable interests, subject to its terms. Deny any incomplete characterization of the statute.

48. Deny.

49. Deny.

50. Admit.

51. Admit that Maverix disputes the alleged prepetition closing and claims retained ownership interests.

52. Admit that an actual controversy exists concerning the parties' rights and interests; deny that the disputed assets were necessarily sold before the petition date.

53. Admit that CR requests declaratory relief. Deny entitlement to the requested declaration.

54. Admit that an appropriate declaration may resolve disputed interests. Deny that the Court should enter the declarations sought by CR.

Maverix denies that CR is entitled to the relief requested in the Complaint's prayer.

## II. Additional Defenses and Limitations on Relief

55. **Retained interests.** The APA and bill of sale expressly exclude specified assets. To the extent owned by Maverix at commencement and not otherwise excluded from the estate, retained interests are estate property. CR's request to limit the estate to one parcel disregards those interests.

56. **Limits of authorized transaction.** The sale order approves the specified APA and its contemplated closing instruments, not an unlimited enlargement of CR's rights over retained property. The nature and extent of any rights granted must be determined from the governing documents and competent evidence.

57. **Disputed completion and timing.** The stated effective date does not alone establish actual execution, electronic delivery, satisfaction or waiver of conditions, or the legally operative transfer date.

58. **Avoidance in the alternative.** If a challenged transfer is found effective, Maverix seeks the avoidance and recovery relief pleaded below, subject to applicable statutory protections. These alternative claims do not admit that CR acquired the rights it asserts.

59. **Reservations preserved.** Sale Order ¶ 7 provides that entry of the Order and approval of the motion, sale transaction, or sale price do not give rise to preclusion, estoppel, waiver, or similar doctrines concerning the value of the Acquired Assets in an action to determine a deficiency owed by Borrowers or Viath, Inc. to CR. Sale Order ¶ 8 separately makes no ruling on commercial reasonableness and expressly reserves and preserves that issue. PSA ¶ 7 preserves every defense to a deficiency claim; and APA Excluded Asset (f) leaves "[a]ny claims of Sellers ... against any Person" with the Sellers.

59A. **Conditions precedent.** The conditions to Closing did not occur, as stated with particularity in the answer to Complaint ¶ 38.

59B. **Automatic stay.** To the extent estate property had not transferred before commencement of this case, Maverix alleges that the affirmative postpetition acts identified in these counterclaims to complete or effectuate its transfer, obtain possession of it, or exercise control over it altered the petition-date status quo and violated 11 U.S.C. § 362(a)(3), absent applicable authorization, relief from the stay, or an exception. Maverix seeks a determination that acts taken in violation of the stay are void. *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372–73 (10th Cir. 1990). Maverix does not allege that mere retention of property, without more, violates § 362(a)(3). *City of Chicago v. Fulton*, 141 S. Ct. 585 (2021).

59C. **Setoff and recoupment.** Maverix's claims in Counts VIII through XIV are asserted in setoff and recoupment against Claim No. 3 and any claim of CR.

59D. **Article 9 limitation.** Any deficiency is limited by C.R.S. § 4-9-626(a) and § 4-9-615(f), and the rights and duties identified in C.R.S. § 4-9-602 may not be waived or varied except as permitted by C.R.S. § 4-9-624.

59E. **Usury.** CR's claims are barred in whole or in part by the usury laws of the State of Colorado.

59F. **Good faith and unclean hands.** CR's claims are barred in whole or in part because CR breached the duty of good faith and fair dealing and by the doctrine of unclean hands.

59G. **Section 502(d).** Claim No. 3 must be disallowed until CR returns any property recoverable under 11 U.S.C. § 550.

59H. **Reservation.** Maverix may amend its defenses and counterclaims as permitted by Fed. R. Civ. P. 15, made applicable by Fed. R. Bankr. P. 7015, and, where applicable, Fed. R. Bankr. P. 7013.

## III. Counterclaims

**Parties, Capacity, Jurisdiction, and Common Facts**

60. Counterclaim Plaintiff Maverix LLC is the Chapter 11 debtor and presently acts as debtor in possession in Case No. 26-16423-MER. A motion for appointment of a Chapter 11 trustee is pending. No qualified Chapter 11 trustee is presently serving.

61. Maverix asserts the estate avoidance powers available under § 1107(a), subject to applicable limitations and orders. Recovery is sought for the estate's benefit, not for Maverix's members individually.

62. Counterclaim Defendant CR is the plaintiff in this adversary proceeding and claims ownership and use rights in the disputed property.

63. These counterclaims arise under or relate to the pending bankruptcy case and the transaction placed at issue by CR. Jurisdiction is invoked under 28 U.S.C. §§ 1334 and 157 and the applicable reference. Avoidance and recovery claims concern matters identified in § 157(b)(2)(H); the property-interest declarations concern § 157(b)(2)(K) and related bankruptcy issues. Venue is proper under 28 U.S.C. § 1409.

64. Maverix's voluntary Chapter 11 petition was docketed on August 31, 2026. Maverix alleges in the alternative that the petition was legally filed on August 30, 2026, if the evidence concerning its transmission and receipt establishes an effective filing on that date under applicable law. Maverix does not presently have complete information sufficient to resolve the legally operative filing date and time. As used in these counterclaims, "Petition Date" means the legally effective date and time of commencement of this case, whether determined to be August 30 or August 31, 2026.

65. The relevant transaction documents name Maverix LLC and Maverix Broadband, Inc. as separate sellers. Maverix asserts these counterclaims only as to its own property interests, obligations, and estate rights, and not solely by reason of a separate entity's ownership of property.

66. The state court entered its Order Granting Receiver's Motion to Approve and Consummate Asset Purchase Agreement on August 28, 2026 (the **Sale Order**). Paragraph 2 approves the APA attached to the receiver's motion. Paragraph 3 authorizes transfer of Acquired Assets excluding Excluded Assets, execution of necessary ancillary instruments, and performance under the APA.

The Sale Order also records authority under the earlier appointment order to negotiate, amend, or modify the APA, subject to the receiver's business judgment.

67. Maverix acknowledges that the Sale Order records a prior non-objection and partial settlement concerning approval and consummation of the APA, and findings favoring the approved transaction. Maverix's scope-of-authority claim concerns rights allegedly added beyond the approved bargain, not an allegation that no sale approval existed.

68. The APA excludes specified assets, including bank accounts, specified outstanding governmental-program amounts, non-assumed contracts and leases, seller claims, equity interests, and intercompany receivables and payables. The bill of sale likewise excludes Excluded Assets.

69. The APA expressly contemplates an IRU. Section 3.1(b)(iv) describes perpetual, irrevocable, royalty-free use and access rights over Grant-Funded Assets to the extent necessary for operation, maintenance, or expansion of the Non-Grant Network or Business. The Fiber Assets definition additionally contemplates an IRU for certain retained assets when ownership transfer is impossible or requires regulatory consent.

70. The executed IRU, by contrast, purports to reach other retained real, personal, tangible, and intangible property, including qualifying Excluded Assets, whenever reasonably essential, necessary, or useful for a Permitted Use. Maverix challenges the extent of the additional interests and obligations imposed, rather than the mere existence of an IRU or the inclusion of every retained asset.

71. The challenged additional grants and burdens (the **Disputed IRU Rights**) include, to the extent they exceed the approved APA and burden Maverix's interests:

a. Sections 1(a), 2.2, and 2.4: coverage of qualifying Excluded Assets and broader retained property, systems, facilities, records, contracts, leases, and third-party rights;

b. Section 2.1: automatic attachment to subsequently covered assets, replacements, additions, relocations, and successor assets;

c. Sections 4.1–4.3: unilateral asset identification and deemed coverage without Maverix's consent, with access continuing during disputes;

d. Sections 8, 9, and 9.1: restrictions on disposition and changes to retained assets and supporting instruments, and subordination of Maverix's retained uses and further grants to CR's rights;

e. Sections 6.2 and 9.2: self-help access, step-in rights, execution of instruments in Maverix's name, an irrevocable power of attorney, and related claim waivers; and

f. Sections 15(d) and 16: restrictions on adverse positions and stipulated litigation concessions concerning CR's asserted IRU rights.

72. Section 5 states that ownership of Covered Assets remains with the grantor. Accordingly, the challenged disposition includes use rights, control rights, burdens, and obligations, whether or not fee ownership was conveyed. Maverix LLC's assets are further described in its filed Schedule A/B.

73. The stated purchase price did not increase when the IRU was added: the purchase price "changed exactly $0" (Aug. 27, 2026 Hr'g Tr. 60:2-3). Competing offers ranged from $12,200,000 to $13,236,500 in February 2026, and Visionary Communications, LLC offered $13,100,000 in cash in November 2025, compared with CR's $7,000,000 credit bid plus $25,000 cash. Those competing offers did not require Maverix to execute or deliver the IRU. On information and belief, based on the value of similar agreements and estimates generated by online valuation calculators, the IRU rights had a value of several million dollars, although no additional purchase-price increase accompanied their inclusion in CR's transaction. Maverix alleges inadequacy of the aggregate consideration for its interests transferred and obligations incurred, not an absence of all consideration merely because the IRU carried no separate fee.

74. The stated transaction consideration is a $7,000,000 credit bid plus $25,000 cash. IRU § 11 states that its consideration is included in that price. Maverix does not allege absence of all consideration merely because no separate IRU fee was charged. Maverix alleges, subject to the supporting valuation and debt-credit facts identified below, that the consideration actually received by Maverix was not reasonably equivalent to its interests transferred and obligations incurred, including the Disputed IRU Rights.

75. On information and belief, based on the asset values reported in Maverix LLC's Schedule A/B and the competing offers described in paragraph 73, Maverix received less than reasonably equivalent value for its interests transferred and obligations incurred in the challenged transaction, including the Disputed IRU Rights. The competing offers did not require Maverix to execute or deliver the IRU, whereas CR obtained the IRU rights without an increase in the stated purchase price. Maverix does not allege that the absence of a separate IRU fee alone establishes inadequate consideration; rather, it alleges that the aggregate consideration described in paragraphs 73–74 was inadequate for the Maverix LLC interests transferred and obligations incurred. Additional information concerning the assets, their value, and the transaction remains in the receiver's possession.

76. The Debtor was insolvent when the transfers provided for by the APA and IRU occurred or was rendered insolvent by them.

77. The APA provides that closing occurs by electronic exchange of executed documents and requires specified closing deliveries. Article 7 provides conditions and waiver mechanisms. The bill of sale bears an August 28, 2026 effective date and a receiver signature but no separate execution date. The copy does not itself resolve when execution and delivery occurred.

78. Maverix first received the closing packet on September 8, 2026. Maverix, through counsel, requested the related signing-envelope information, which has not been produced to it. Those circumstances support investigation of timing but are not alleged as conclusive proof of postpetition transfer.

79. On information and belief, based on the absence of execution dates and the closing-record circumstances above, Maverix disputes that all legally operative steps necessary for the challenged transfers were completed before the Petition Date. The exact signing, delivery, payment, condition-satisfaction or waiver, and transfer dates are within records to be obtained from CR, the receiver, and relevant custodians.

80. The following claims are pleaded in the alternative: if no effective transfer occurred, retained interests remain Maverix's; if an effective prepetition transfer or obligation occurred, statutory prepetition avoidance is sought; if a transfer of estate property occurred postpetition without Code or bankruptcy-court authorization, postpetition avoidance is sought.

**COUNT I — Declaration Concerning Retained and Excluded Assets**

81. Maverix incorporates paragraphs 60–80 solely to the extent consistent with this count.

82. An actual controversy exists because CR seeks a declaration that Maverix's estate consists solely of the identified real property, while the transaction documents retain specified assets and rights.

83. At commencement of this case, Maverix owned interests in the excluded or otherwise untransferred assets described in paragraph 68, to the extent those assets belonged to Maverix LLC rather than Maverix Broadband, Inc., including, but not limited to, bank accounts, outstanding governmental-program amounts excluded under the APA, non-assumed contracts and leases, seller claims, equity interests, and intercompany receivables and payables. To the extent retained by Maverix at commencement and subject to § 541's terms, those interests are property of Maverix's estate. Retained ownership does not, by itself, establish that those interests are free of any valid lien or authorized IRU right.

84. Retention of ownership is distinct from the validity or scope of any authorized IRU right. Maverix seeks a declaration identifying its retained interests and determining CR's rights, if any, without assuming all retained interests are unencumbered.

85. Maverix requests a declaration under 28 U.S.C. § 2201 and Bankruptcy Rule 7001(b) and (i) identifying its retained estate interests and rejecting CR's proposed limitation of the estate to one parcel.

**COUNT II — Declaration Concerning Scope and Enforceability of Disputed IRU Rights**

86. Maverix incorporates paragraphs 60–80 solely to the extent consistent with this count.

87. The approved APA contemplated a defined IRU and ancillary instruments, but Maverix alleges that the Disputed IRU Rights materially enlarged the burden on its retained interests beyond the authorized transactions.

88. CR asserts those rights against Maverix, creating an actual controversy regarding their scope and enforceability.

89. Maverix seeks a declaration that, to the extent the identified Disputed IRU Rights exceeded the receiver's lawful authority and the authorized bargain, those rights are not enforceable

against Maverix or its estate, and alternatively that the IRU must be construed within the authorized scope. Maverix does not assert a categorical rule that every departure from receiver authority automatically voids the entire sale.

**COUNT III — Declaration Concerning Closing and Transfer Timing**

90. Maverix incorporates paragraphs 60–80 solely to the extent consistent with this count.

91. CR asserts that the transaction closed and conveyed the disputed interests before the Petition Date. Maverix disputes that assertion on the grounds stated above.

92. The controversy requires determination of actual execution and electronic delivery, closing conditions satisfied or waived, any agreed alternate closing date, and the operative transfer rules applicable to each disputed interest.

93. Maverix seeks a declaration that CR did not acquire the identified interests before the Petition Date to the extent the evidence establishes that necessary transfer events had not occurred, and a determination of the estate interests remaining at commencement. A document's stated effective date alone is not offered as proof of its signing or delivery date.

**COUNT IV — Alternative Avoidance of Prepetition Transfers and Obligations**
**11 U.S.C. § 548(a)(1)(B)**

94. Maverix incorporates paragraphs 60–80 solely to the extent consistent with this count, including the property, valuation, consideration, and financial-condition allegations in paragraphs 73–76.

95. If the challenged transaction or Disputed IRU Rights became effective before commencement of this case, Maverix alleges that the challenged transfers of its property interests or incurrence of obligations occurred within two years before commencement, including on August 28, 2026, as CR alleges. The challenged property interests and obligations are Maverix LLC's interests transferred and obligations incurred under the APA and IRU, including, but not limited to, the Disputed IRU Rights.

96. Maverix received less than reasonably equivalent value for those interests or obligations. The comparison includes the credit actually applied to Maverix's debt, cash and other consideration actually received by Maverix, the value of all Maverix interests conveyed in exchange, and any supported allocation between sellers. The basis for Maverix's allegation of inadequate consideration is described in paragraphs 73–75.

97. Maverix was insolvent when the challenged prepetition transfers occurred or obligations were incurred, or was rendered insolvent by them, including on August 28, 2026, if that is determined to be the legally operative date. CR alleges that after the sale the Debtor's estate "consists solely of" the real property at 3144 County Road 186 (Complaint ¶¶ 42, 49), which the Elbert County Assessor values at $846,200, while the Debtor's scheduled liabilities total $21,435,220.58. After the transfer the Debtor had no means to pay its debts as they came due.

98. Maverix seeks avoidance under § 548(a)(1)(B) of the identified transfers and obligations to the extent permitted by law, subject to applicable protections, including § 548(c). Statutory transfer timing under § 548(d)(1) must be applied to the particular interest, rather than assumed solely from the instrument's effective date.

99. This count is timely under § 546(a) because these counterclaims are filed on October 15, 2026, within two years after the order for relief (11 U.S.C. § 546(a)) and, for Count V, within four years after the transfer (C.R.S. § 38-8-110(1)(b)). The case remains open.

**COUNT V — Conditional Alternative Avoidance Under Colorado Law**
**11 U.S.C. § 544(b)(1) and C.R.S. § 38-8-106(1)**

100. Maverix incorporates paragraphs 60–80 and 95–97 solely to the extent consistent with this count.

101. On the Petition Date, at least two creditors held unsecured claims against Maverix that are allowable under § 502, arose before the challenged transfer or obligation, and remained outstanding at commencement: (a) Prodigy Excavating LLC, in the amount of $2,600,069.08, for services provided to Maverix before February 12, 2026 (Schedule E/F, Docket No. 69-1, line 3.22); and (b) Core Industries LLC, in the amount of $111,502.91, for services provided to Maverix from before February 12, 2026 through April 12, 2026 (id., line 3.9). Neither claim is scheduled as contingent, unliquidated or disputed. Each creditor could avoid the identified transfer or obligation under C.R.S. § 38-8-106(1), which makes a transfer ""voidable as to a creditor whose claim arose before the transfer was made" if the debtor made it "without receiving a reasonably equivalent value in exchange" and "was insolvent at that time or . . . became insolvent as a result," as alleged in paragraphs 75–76. Maverix disputes the applicability of the defense under C.R.S. § 38-8-109(5)(b), which requires enforcement of a security interest in compliance with Article 9. Maverix alleges that the challenged disposition was a private sale to the secured party itself by credit bid and did not comply with Article 9, as alleged elsewhere in these counterclaims. To the extent CR invokes that defense, CR bears the burden of proving its applicability under C.R.S. § 38-8-109(7)(a).

102. If the challenged transfers or obligations became effective before commencement of this case, including on August 28, 2026, as CR alleges, Maverix transferred its interests in the Acquired Assets or became bound by the challenged IRU obligations without receiving reasonably equivalent value, and Maverix was insolvent or became insolvent as a result, as alleged in paragraphs 73–76 and 97.

103. The transfer or obligation is voidable as to the identified preexisting creditor under C.R.S. § 38-8-106(1). Maverix, as DIP, seeks avoidance through § 544(b)(1), subject to applicable statutory defenses and limitations.

104. This count is timely because these counterclaims are filed on October 15, 2026, within two years after the order for relief (11 U.S.C. § 546(a)) and, for Count V, within four years after the transfer (C.R.S. § 38-8-110(1)(b)). The case remains open. No untimely or otherwise unavailable creditor claim is assumed.

**COUNT VI — Alternative Avoidance of Unauthorized Postpetition Transfers**
**11 U.S.C. § 549(a)(1) and (a)(2)(B)**

105. Maverix incorporates paragraphs 60–80 solely to the extent consistent with this count. This count is alternative to claims premised on an effective prepetition disposition.

106. To the extent the challenged property interests had not transferred before commencement of this case, Maverix LLC's interests in the assets and rights described in the APA and IRU, including, but not limited to, its assets identified in Schedule A/B, remained property of its estate, subject to § 541's terms. This count concerns only Maverix LLC's interests that were subsequently transferred, not property belonging solely to Maverix BroDeny. Under the Bid Procedures, whether a bid was a Qualified Bid was "as determined by Borrowers, in consultation with Lender." By the December 5, 2025 deadline Visionary Communications, LLC delivered an asset purchase agreement on its $13,100,000 cash letter of intent, which paid CR in full at closing. adband, Inc.

107. After the Petition Date, the Receiver and CR transferred estate property to CR or its designee, including by: (a) completing closing deliveries under the APA that, under APA § 9.4, were deemed given no earlier than August 31, 2026, and that were first provided to Maverix on September 8, 2026; (b) the "practical turnover to CooperReilly's operating company" the Receiver describes (Docket No. 49-2 at 4); (c) delivery of logins, credentials and records the Bill of Sale makes due "at or promptly following the Closing" (Docket No. 51-4 at 5, ¶ (f)); (d) removal of equipment, including the Vermeer PTX42 and PTX44 trenchers, from the storage yard at 1490 County Road 186 between about September 1 and September 20, 2026; and (e) the change of the owner of Maverix's Slack workspace on September 18, 2026. Under Fed. R. Bankr. P. 6001, CR bears the burden of proving the validity of any postpetition transfer.

108. The identified transfers were not authorized under the Bankruptcy Code or by the bankruptcy court. Specifically, no order of this Court authorized any transfer of estate property to CR. This Court authorized the Receiver only "to continue holding the Debtor's property currently in the Receiver's possession" and ordered that "[n]othing in this Order determines ownership of any property in dispute in this case" (Docket No. 87 ¶¶ 3-4). Docket No. 35 ¶ 3 reaches only property related to non-debtor Maverix Broadband, Inc. No motion under 11 U.S.C. § 363 was filed. Maverix does not rely solely on the absence of a separate bankruptcy sale order.

109. The state-court Sale Order preceded bankruptcy. Maverix alleges that it did not authorize a postpetition disposition under the Bankruptcy Code or substitute for any bankruptcy authorization legally required for the particular transfer.

110. This is a voluntary case, so § 549(b) does not apply. To the extent a challenged transfer concerns an interest in real property, the applicability of § 549(c) must be determined from the nature of the interest transferred and the facts concerning the statutory requirements. Maverix does not concede that any challenged transfer is protected by § 549(c).

111. These counterclaims are filed on October 15, 2026, within two years after each challenged postpetition transfer and before closure or dismissal of this case. Count VI is therefore timely under 11 U.S.C. § 549(d).

112. Maverix seeks avoidance under § 549(a), to the extent not protected by an applicable exception, of the identified unauthorized postpetition transfers.

**COUNT VII — Recovery of Avoided Transfers**
**11 U.S.C. § 550(a)(1)**

113. Maverix incorporates the supported allegations in paragraphs 60–80 and the applicable avoidance count, but does not incorporate inconsistent timing theories as simultaneous facts.

114. CR was the initial transferee of the challenged property rights, receiving and exercising dominion over them. CR is sued in this count as initial transferee, not merely as a later recipient or conduit.

115. To the extent the transfers are avoided under § 544, § 548, or § 549, Maverix seeks recovery for the estate of the transferred property interests or, if the Court so orders, their value. For transferred use rights, the requested relief includes restoration of the estate's interests free of avoided rights or a value recovery as appropriate, without presuming the estate is entitled to the full ownership value of the underlying assets.

116. Recovery will benefit the estate by restoring property or proceeds available for administration and distribution to creditors. The requested recovery is not for a separate seller's property merely because that seller joined the transaction documents.

117. This recovery claim is timely under § 550(f), being asserted with avoidance and before closure or dismissal. Maverix seeks only a single satisfaction under § 550(d), subject to applicable defenses, liens, and credits, including any protection under § 550(e).

**COUNT VIII — Fraud (fraudulent inducement of the Second Forbearance Agreement, and promissory fraud in the Partial Settlement Agreement)**
118. Maverix incorporates paragraphs 60–80.

***A. The Second Forbearance Agreement (October 14, 2025)***
119. **Who, when and where.** On October 14, 2025, at 9:37 a.m. Mountain time, CR's counsel, Patrick R. Akers of Markus Williams Young & Hunsicker LLC, emailed the final Second Forbearance Agreement to David Lindauer and Tyler Bartholomew, who were acting on behalf of the borrower entities, and stated that it would be sent "via DocuSign momentarily." CR executed the agreement through its manager, D. Matthew Middelthon, and the borrower entities executed it through Lindauer and Bartholomew in their representative capacities the same day.

120. **What.** In Article 3 CR represented and promised that, "[i]f, seven (7) days before the Auction, the Borrowers are engaged in bona fide negotiations with a qualified purchaser that would satisfy the Obligations in full, then the Lender shall consider a good faith postponement

of the Auction for the Borrowers to consummate the proposed transaction," conditioned only on "customary extension fees and the execution of a binding purchase agreement." In the Bid Procedures it attached as Exhibit B, CR agreed that the qualification of bids would be "as determined by Borrowers, in consultation with Lender," and that the Borrowers could "deem an otherwise not Qualified Bid to be a Qualified Bid."

121. **Why it was false.** On information and belief, when CR made these promises it did not intend to perform them, and it made them to obtain the Borrowers' signatures, the release in Section 2.13, the extension fee and the Borrowers' agreement to an ex parte receivership. That intent is shown by what CR did when the exact circumstance Article 3 describes arose, within 54 days:

(a) on November 12, 2025 the Borrowers signed an exclusive $13,100,000 cash letter of intent with Visionary Communications, LLC, and by the December 5, 2025 bid deadline Visionary delivered an asset purchase agreement that paid CR in full at closing;

(b) on December 7, 2025, at 8:05 p.m. Mountain time, Mr. Middelthon emailed the Borrowers that "Visionary is not a Qualified Bidder," that "there will be only one Qualified Bidder: CooperReilly," that "there is no need to hold an auction," and that CR "expects Maverix to accept the CooperReilly APA" by December 12, 2025, although the Bid Procedures assigned that determination to the Borrowers;

(c) in the same email CR conditioned any postponement on $250,000 by December 12, 2025, which it described as an amount that "represents interest during that same period," not a customary extension fee;

(d) on December 8, 2025, Douglas Hannah of Silverleaf Advisors LLC transmitted CR's credit-bid APA "for the secured lender to credit bid on Friday," stating that otherwise "Mr. Akers will have no choice but to pursue a receiver through the courts to run the company";

(e) on December 11, 2025, at 9:29 p.m. Mountain time, Mr. Middelthon wrote to Mr. Lindauer: "It is this APA or the courts....it's truly that simple. It's time for pens down on anything related to Visionary"; and

(f) on January 13, 2026, CR sought an ex parte receiver.

122. **Reliance.** The Borrowers relied on CR's promises by signing the Second Forbearance, paying the extension fee it required, giving the release in Section 2.13, consenting to the receivership remedy in Section 2.18 and running the sale process on CR's timetable. Their reliance was justified because the promises were express terms of the written agreement.

***B. The Partial Settlement Agreement (May 13, 2026)***

123. **Who, when and where.** On May 13, 2026, CR, through Mr. Middelthon, and represented by Mr. Akers, executed the Partial Settlement Agreement (the "PSA") (Docket No. 49-18) with the Maverix entities.

124. **What.** In PSA § 3, CR represented and promised that it “shall cause the Receiver to abandon the BEAD Grants or, should the Receiver not abandon the BEAD Grants, file a motion for the Receiver to abandon the BEAD Grants,” and stated the purpose of that promise: “to permit Maverix to consummate the BEAD Grants with the State of Colorado, and begin work thereunder without the necessity of the Receiver’s involvement in the same.”

125. **Why it was false.** On information and belief, when CR made that promise it did not intend that Maverix be able to consummate the BEAD Grants free of the Receiver’s involvement. After the PSA, CR withheld consent to the grant work on which completion of the State’s enhanced monitoring, and therefore execution of the BEAD subgrants, depended: the Receiver reported that CR “has stated that it does not want the estate to perform additional grant work,” while the Receiver “continues to confer with the CBO about possible outcomes for the six current grant projects” (Receiver’s Third Report at 5, Docket No. 49-12). The Colorado Broadband Office’s own report states that its review of the grant projects was initiated on June 3, 2026, three weeks after the PSA (Comprehensive Monitoring Report, Sept. 21, 2026), and the Receiver reported that throughout June and July 2026 it continued to confer with the CBO about those projects (Docket No. 49-12 at 5). CR then pressed to consummate the sale and asserts that it closed on August 28, 2026, while execution of the BEAD subgrants awaited completion of that monitoring. Maverix disputes whether and when the sale legally closed, as alleged elsewhere in these counterclaims. On September 21, 2026, the Colorado Broadband Office rescinded the BEAD awards.

125A. CR itself was in communication with the Colorado Broadband Office about Maverix’s grants after the PSA. On July 27, 2026, on a recorded call with Brad Billman and John Goutell, CR’s telecommunications counsel, Jenifer Snyder, stated: “even from the CBO, we’ve been told that there are no active grant assets,” and, of “the Maverix BEAD grants” and the NTIA extension for signing them, “I learned that from the broadband office last week.” Maverix later confirmed CR’s contacts with the CBO through the State. The statements are offered to show CR’s communications with the CBO and its knowledge of the BEAD timeline, not the validity or amount of any disputed claim (Fed. R. Evid. 408(b)).

126. **Reliance and damage.** Maverix relied on the promise by withdrawing its opposition to the APA in the Notice of Non-Objection, and lost its interest in the BEAD Grants. Maverix was damaged in an amount to be proven at trial, and seeks damages and recoupment against Claim No. 3. The BEAD count is asserted to the extent of the Debtor’s interest; Maverix acknowledges PSA ¶ 11 and pleads this claim here so that it is not lost under Fed. R. Civ. P. 13(a), reserving its position on venue.

126A. **Facts within CR’s control.** The communications that would show CR’s intent, and CR’s and the Receiver’s communications with the Colorado Broadband Office after the PSA, are in the possession of CR, the Receiver and the State. Maverix has sought them and been refused: (a) on June 17, 2026, Viath, Inc. demanded the Receiver’s invoices from the Receiver’s counsel, copying CR’s counsel, and CR did not provide them, although the Receiver had written on June 9, 2026 that CR, not Maverix, “receive[s] copies of these invoices”; (b) on October 9, 2026, the Receiver’s counsel declined to produce most of the 43 categories of records the Debtor requested on October 6, 2026; and (c) Maverix’s September 23 and 24, 2026 requests under the Colorado Open Records Act for the State’s communications concerning Maverix have produced only a cost

estimate. Allegations on information and belief are therefore made on the facts stated, as Rule 9(b) permits where the facts are peculiarly within the opposing party's knowledge. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236–37 (10th Cir. 2000). Maverix will seek leave to amend as discovery proceeds.

127. Maverix alleges that CR procured the Second Forbearance Agreement and the PSA through fraudulent inducement and disputes that the release in the Second Forbearance Agreement bars that claim. Maverix's fraudulent-inducement claims rest on an alleged breach of a duty independent of CR's contractual performance obligations: the duty not to induce an agreement through knowingly false representations or promises made without an intent to perform. Such independently grounded precontractual misrepresentations are not barred by the economic loss rule. *Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, ¶¶ 12–15, 373 P.3d 603.

**COUNT IX — Breach of Contract (Loan Documents, including the Second Forbearance Agreement and Bid Procedures, and the Partial Settlement Agreement)**

128. Maverix incorporates paragraphs 60–80 and 119–126.

129. The Loan and Security Agreement of March 22, 2024, as amended and as modified by the Second Forbearance Agreement of October 14, 2025 and its Bid Procedures (the "Loan Documents"), are valid contracts between CR and the Borrowers. The PSA is a valid contract between CR and the Maverix entities.

130. The Borrowers performed their obligations, or were excused from performing them by CR's breaches.

131. CR breached the Loan Documents by:

(a) failing to consider in good faith a postponement of the Auction when, seven days before it, the Borrowers were engaged in bona fide negotiations with Visionary Communications, LLC, a purchaser whose transaction would have satisfied the Obligations in full (Second Forbearance art. 3);

(b) conditioning any postponement on a $250,000 payment it described as interest, rather than "customary extension fees" (id.);

(c) declaring on December 7, 2025 that Visionary was not a Qualified Bidder and that no auction was needed, usurping the determination the Bid Procedures assign to the Borrowers "in consultation with Lender";

(d) continuing to exercise consultation and control over the sale after its December 11, 2025 credit bid, when the Bid Procedures provide that a Lender that credit-bids "shall immediately no longer have any consultation or related information rights"; the Receiver later reported that it ran the sale "[i]n consultation with CooperReilly" and selected the bid "in consultation with the Senior Lender" (Docket No. 49-15 at 2); and

(e) charging fees that are not "reasonable and documented," as the Loan Documents require (Claim No. 3 attaches no invoice for $1,044,167.72 of fees and costs).

132. CR breached PSA § 3 by causing or permitting the Receiver's continued involvement in the BEAD Grants, and in the grant work on which execution of the BEAD subgrants depended, contrary to the PSA's stated purpose.

133. These breaches occurred after October 14, 2025, the Effective Date of the release in Section 2.13 of the Second Forbearance, and are not released.

134. As a result, Maverix lost the Visionary transaction, which would have paid CR in full and left surplus value, incurred the default interest, fees and receivership costs CR now claims in Claim No. 3, and lost its interest in the BEAD Grants. Maverix seeks recoupment against Claim No. 3 and damages in an amount to be proven at trial.

**COUNT X — Breach of the Implied Covenant of Good Faith and Fair Dealing**

135. Maverix incorporates paragraphs 60–80 and 128–134.

136. Every Colorado contract contains an implied covenant of good faith and fair dealing, which applies when one party has discretion over terms of performance such as quantity, price or time. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995); C.R.S. § 4-1-304.

137. The Loan Documents gave CR discretion over whether and on what terms to postpone the Auction, over the extension fee it could require, and, through its consultation and consent rights, over the sale process and the receivership estate's transactions over $10,000. The PSA gave CR control over how the BEAD Grants would be released from the receivership.

138. CR exercised that discretion inconsistently with the parties' agreed purposes and the Borrowers' justified expectations, by the conduct alleged in paragraphs 121, 125 and 131–132, including refusing a postponement for a transaction that would have paid it in full, demanding $250,000 described as interest as the price of considering one, and withholding consent to grant work while the BEAD subgrants awaited execution.

139. As a result, Maverix was damaged as alleged in paragraph 134. Maverix seeks recoupment against Claim No. 3 and damages in an amount to be proven at trial.

**COUNT XI — Abuse of Process**

140. Maverix incorporates paragraphs 60–80 and 118–139.

140A. Article 9 permits a secured party to buy its collateral at a private disposition only if the collateral "is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations"; otherwise the secured party may buy only at a public disposition. C.R.S. § 4-9-610(c). A fiber network is neither. CR knew it: on October 6, 2025, CR noticed a public Article 9 disposition of the Borrowers' collateral for October 16, 2025.

140B. Eight days later, in the Second Forbearance, CR conditioned forbearance on the Borrowers' agreement to the appointment of an ex parte receiver to "administer and conclude the sale of any or all of the Collateral pursuant to the Sale Process" (Complaint ¶ 22), under Bid Procedures that allowed CR to credit-bid.

140C. CR submitted its credit-bid APA on December 11, 2025. On January 13, 2026, CR moved ex parte for a receiver, and the January 22, 2026 Receivership Order, entered without bond (Receivership Order ¶ 3), authorized the Receiver to "administer and conclude the Sale Process ... including, without limitation, executing and, if necessary, negotiating changes to, amending, or modifying the APA," which was CR's own credit-bid APA (Complaint ¶ 32).

140D. CR then funded the receivership; as the Receiver wrote on June 9, 2026, "CooperReilly is exclusively funding the administrative costs of this receivership estate"; the Receiver ran the sale "[i]n consultation with CooperReilly" (Docket No. 49-15 at 2), and the Receivership Order required CR's approval for transactions over $10,000 (Docket No. 49-12 at 5). The Receiver's proposed order of May 8, 2026, which CR supported, asked the state court to find the sale commercially reasonable, a finding that would have made it so as a matter of law under C.R.S. § 4-9-627(c)(1). On August 27, 2026, the court directed that the order "NOT ... INCLUDE LANGUAGE REGARDING COMMERCIAL REASONABLENESS." The entered Sale Order expressly provides that neither its entry nor approval of the motion, sale transaction, or $7,025,000 sale price gives rise to claim preclusion, issue preclusion, estoppel, waiver, or any similar doctrine concerning the value of the Acquired Assets in an action to determine a deficiency owed by Borrowers or Viath, Inc. to CR. The Order separately makes no ruling on commercial reasonableness and expressly reserves and preserves that issue. Accordingly, Maverix disputes that the sale approval conclusively establishes commercial reasonableness under C.R.S. § 4-9-627(c)(1). (Docket No. 51-3 at 3, ¶¶ 7–8.) CR asserts that the Receiver sold the Borrowers' assets to CR for its credit bid on August 28, 2026, although the receivership's own process had produced offers of $12,200,000 to $13,236,500. Maverix disputes whether and when the sale legally closed, as alleged elsewhere in these counterclaims.

140E. **Ulterior purpose.** CR used the receivership proceeding to accomplish what Article 9 does not permit a secured party to do directly: to acquire its collateral by a private credit-bid disposition to itself, outside the notice, public-disposition and commercial-reasonableness requirements of Part 6, while preserving a deficiency claim, and to obtain through a court approval the commercial-reasonableness protection of § 4-9-627(c)(1). CR now invokes the receiver's sale in this adversary proceeding (Docket No. 51) to argue that the assets left the estate.

140F. **Improper use of process.** CR's use of the receivership, a proceeding to preserve and administer property for the benefit of those interested in it, as the vehicle for a private disposition of the collateral to the secured party itself, funded and directed by that secured party after its credit bid ended its consultation rights, was not proper in the regular course of the proceeding. CR's petition lacked a cognizable basis in law for that purpose, its primary purpose was to acquire the collateral below its value while preserving a deficiency, and it adversely affected Maverix's legal interests in its property and in any surplus.

141. **Damages.** Maverix was damaged by the loss of its assets below value and of any surplus, by the default interest, fees and receivership costs CR claims in Claim No. 3, and by the loss of its interest in the BEAD Grants, in an amount to be proven at trial. This count seeks damages for CR's conduct; it does not ask this Court to review or set aside any state-court order.

**COUNT XII — Objection to Claim No. 3 and Determination of Secured Status**

142. Maverix incorporates paragraphs 60–80.

143. CR filed Claim No. 3 for $7,011,269.65, after crediting its $7,000,000 credit bid, and asserts it as secured by all personal property, with collateral value "Unknown."

144. Article 9 governs the deficiency. On October 6, 2025, CR noticed a public disposition of the Borrowers' collateral as "Secured Party," and Claim No. 3 seeks the deficiency remaining after a disposition of collateral to CR itself by credit bid. Maverix places CR's compliance with Part 6 of Article 9 in issue, so CR bears the burden of proving that the disposition was conducted in accordance with Part 6. C.R.S. § 4-9-626(a)(2).

145. A secured party may buy collateral at a private disposition only if it "is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." C.R.S. § 4-9-610(c)(2). The fiber-network assets involved in the challenged disposition were neither of a kind customarily sold on a recognized market nor the subject of widely distributed standard price quotations. Accordingly, Maverix alleges that CR's purchase of those assets at a private disposition did not satisfy the requirements governing a secured party's purchase of collateral. *Cooper Investments v. Conger*, 775 P.2d 76, 80–81 (Colo. App. 1989).

146. If CR fails to prove compliance with Part 6, and subject to C.R.S. § 4-9-628, any deficiency is limited to the amount by which the secured obligation, reasonable expenses, and reasonable attorney's fees exceed the greater of the actual proceeds or the proceeds a complying disposition would have produced. The latter proceeds are presumed to equal the secured obligation, reasonable expenses, and reasonable attorney's fees unless CR proves a lesser amount. Unless rebutted, that presumption leaves no deficiency. C.R.S. § 4-9-626(a)(3)–(4). Alternatively, the deficiency must be calculated on the price a complying disposition to an unrelated buyer would have brought. C.R.S. § 4-9-615(f). Maverix alleges that the disposition proceeds were significantly below the range of prices that a complying disposition to a purchaser other than CR, a person related to CR, or a secondary obligor would have brought, and acknowledges its burden to establish that fact under C.R.S. § 4-9-626(a)(5). Visionary offered $13,100,000 in cash in November 2025, and the Receiver's own February 2026 process produced offers of $12,200,000 to $13,236,500, against CR's $7,025,000; the Sale Order records BAM Broadband's "approximately $12.2 million proposal" (Docket No. 51-3 at 2).

147. Claim No. 3 includes $1,044,167.72 of fees and costs with no invoices, does not credit the $25,000 in cash CR paid on August 27, 2026, and, on CR's own allegation that the estate holds only real property that is not CR's collateral (Complaint ¶¶ 42, 49), seeks postpetition amounts barred by 11 U.S.C. §§ 502(b)(2) and 506(b). CR's lien also does not reach commercial tort claims not described in its security agreement, deposit accounts it does not control, titled vehicles on whose certificates its lien is not noted, or postpetition revenue. C.R.S. §§ 4-9-108(e)(1), 4-9-204(b)(2), 4-9-311(a)(2), 4-9-312(b)(1); 11 U.S.C. § 552(a).

148. Maverix requests that the Court disallow Claim No. 3 or reduce it to the amount allowed by C.R.S. §§ 4-9-615(f) and 4-9-626; determine CR's secured status under § 506(a); disallow undocumented and unreasonable fees and all postpetition interest, fees and charges; credit the

$25,000 payment; and disallow the claim under § 502(d) until CR returns any property recoverable under § 550.

**COUNT XIII — Equitable Subordination (11 U.S.C. § 510(c); Fed. R. Bankr. P. 7001(h))**
149. Maverix incorporates paragraphs 60–80 and 118–139, together with all allegations of Count XI, including paragraphs 140–140F and its damages allegations in paragraph 141, solely to the extent consistent with this count.

150. CR engaged in inequitable conduct, including the conduct alleged in Counts VIII through XI. It directed the sale after its credit bid ended its consultation rights, funded the Receiver and now claims the receivership's costs in Claim No. 3, and acquired the Debtor's assets by credit bid millions of dollars below the offers the same process produced. That conduct injured the Debtor's other creditors and gave CR an unfair advantage, and subordination is consistent with the Bankruptcy Code. Maverix requests that any allowed claim of CR be subordinated to all other allowed claims and that any lien securing it be transferred to the estate under § 510(c)(2).

**COUNT XIV — Turnover and Declaration that Postpetition Acts Are Void (11 U.S.C. §§ 362(a)(3), 542(a); Fed. R. Bankr. P. 7001(a), (i))**
151. Maverix incorporates paragraphs 60–80 and 105–112. To the extent CR or any entity acting for it holds property of the estate, including the equipment, credentials, records and accounts described in paragraph 107, it must deliver that property or its value to Maverix. 11 U.S.C. § 542(a). To the extent the property described in paragraph 107 remained estate property at commencement, Maverix alleges that the affirmative postpetition acts identified there to complete or effectuate its transfer, obtain possession of it, or exercise control over it altered the petition-date status quo and violated 11 U.S.C. § 362(a)(3), absent applicable authorization, relief from the stay, or an exception. Maverix seeks a declaration that acts taken in violation of the stay are void. *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372–73 (10th Cir. 1990). Mere retention of property, without more, is not alleged as a violation of § 362(a)(3). *City of Chicago v. Fulton*, 141 S. Ct. 585 (2021). Maverix separately seeks turnover and an accounting under § 542(a).

## IV. Prayer for Relief
Maverix requests judgment:

A. Denying CR's requested declaration that the estate consists solely of the identified real property;

B. Identifying Maverix's retained and excluded estate interests and determining the extent of CR's rights, if any;

C. Declaring the Disputed IRU Rights unenforceable to the extent the Court finds they exceeded the receiver's lawful authority, or construing them within the authorized transaction;

D. Determining whether and when the identified transfers became effective and which interests remained with Maverix at commencement;

E. Alternatively, avoiding the specifically pleaded prepetition transfers or obligations under § 548 and, if its required facts are established, § 544(b) and Colorado law;

F. Alternatively, avoiding the specifically pleaded unauthorized postpetition transfers under § 549;

G. Recovering the avoided property interests or, if ordered, their value under § 550, for the estate's benefit and without duplicate satisfaction;

H. Recognizing automatic preservation under § 551 of avoided transfers within that provision's scope;

I. Awarding taxable costs, prejudgment interest to the extent legally available, and postjudgment interest as provided by law;

J. Awarding damages for fraud, and recoupment against Claim No. 3 (Count VIII);

K. Awarding damages for breach of the Loan Documents and the Partial Settlement Agreement, and recoupment against Claim No. 3 (Count IX);

L. Awarding damages for breach of the implied covenant of good faith and fair dealing, and recoupment against Claim No. 3 (Count X);

M. Awarding damages for abuse of process (Count XI);

N. Disallowing or reducing Claim No. 3, determining CR's secured status, disallowing postpetition interest, fees and charges and undocumented fees, crediting the $25,000 payment, and disallowing the claim under § 502(d) (Count XII);

O. Subordinating any allowed claim of CR and transferring any lien securing it to the estate (Count XIII);

P. Declaring void all postpetition acts in violation of § 362(a)(3), and ordering turnover and an accounting (Count XIV); and

Q. Granting other relief warranted by the supported claims and evidence.

Dated: October 15, 2026

Respectfully submitted,

By: /s/ Matthew C. Campbell
Co. Reg. No. 42713
LAW OFFICES OF MATTHEW C. CAMPBELL LLC.
170 E 12th St. Ste. 9 Durango, CO 81301
(970) 422-4270 phone
(970) 478-0178 fax
matthew@cswlegal.com
**Counsel for Maverix LLC, Debtor and Debtor-in-Possession**

CERTIFICATE OF SERVICE

I certify that the foregoing document was served on counsel for the Plaintiff through the ECF system on this 15th day of October, 2026.

/s/ Matthew C Campbell